Craig WINTERS, Appellant

v.

CHUBB & SON, INC. & Deanne Gordon, Appellees.

No. 14–03–00248–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 18, 2004.

Peter Costea, Houston, for appellant.

Martin Wickliff, Jr., Norasha Lynn Williams, Houston, for appellees.

Panel consists of Justices YATES, HUDSON, and FOWLER.

## OPINION

J. HARVEY HUDSON, Justice.

Craig Winters ("Winters") sued Chubb & Son ("Chubb") and Deanne Gordon ("Gordon") for discrimination under the section 21.051 of the Texas Commission on Human Rights Act ("TCHRA"), intentional infliction of emotional distress, and defamation. He pursued Gordon separately in a suit for fraud. In two orders, the trial court granted summary judgment as to all causes of action and awarded attorney fees and costs to Gordon. On appeal, Winters only challenges the grant of summary judgment on his race discrimination cause of action against Chubb and the separate award of attorney fees to Gordon. We affirm.

Winters was hired by Chubb in November 1997 to work as an underwriter in Chubb's Department of Financial Institutions ("DFI") section. Immediately after being hired, Winters was sent to training in Warren, New Jersey. Upon completing this training, Winters returned to Houston and began working in the DFI section under Gordon's supervision. Gordon managed the DFI section until June 1998, when she was transferred to the commercial section. Lewis Hall, a senior underwriter, was promoted to manage the DFI section. Subsequently, Hall left the regional manager position and resumed his duties as a senior property casualty underwriting specialist for the region. Gordon returned to the DFI section in July 1999 and resumed her managerial duties.

Winters was issued his underwriting authority in January 1998. However, Gordon and Winters met on December 20, 1998, to discuss several issues related to Winters's job performance, and pursuant thereto, Winters's underwriting authority was revoked. Gordon drafted a memo summarizing the issues and reasons for revoking his underwriting authority. She listed the problems forming the basis for her decision to revoke the underwriting authority:

1. Bank United: This was a December renewal that was brought to my attention in that we had not addressed the Y2K issues and the Premium quoted was incorrectly calculated.

2. First American Adam Corp. The premiums quoted were incorrect with respects to the TIV and rate needed on the account.

3. Eagan: There was not proper follow-up on the Louisiana Banker program. It was up to Chubb to complete a market letter and we did not follow-up.

4. Sterling. A Venture Capital prospect had not been wipped in.

Unsure of Winters's abilities, Gordon revoked his underwriting authority on December 20, 1998. The revocation was to be reevaluated in 30 and 60 days and would include a review of his files. This action was characterized as a "verbal warning."

The revocation does not appear to have altered Winters's official duties as an underwriter. Winters was permitted to continue in his underwriting duties; however, any new lines or renewals had to be signed off by Gordon or Lewis. Winters testified in his deposition that his job title stayed the same and he remained at the same pay level.[1]

Subsequently, Gordon asked Hall to perform an audit of all of the underwriter's files. In Lewis's audit, Winters received a majority of "good" marks, but the audit also revealed that Winters needed improvement in several key areas: adherence to underwriting guidelines, rate premium development and documentation, pricing adequacy, and CID risk analysis report documentation.

Thirty days following the verbal warning, Gordon met with Winters to discuss his progress. Gordon noted in a memo that she "had not seen any improvement and that he [Winters] had thirty days to correct the issues." She also commented that she had discussed the need for Winters to improve his listening skills. Included in the memo was "an additional example where [she] had seen issues." She noted that Winters had failed to correctly calculate the numbers for American General Bonds and neglected to ask for assistance.

Sixty days following the verbal warning, Gordon again met with Winters to discuss the end of the verbal warning period. Acknowledging the effort that Winters had put into improving,[2] Gordon removed Win-

---

1. Gordon also explained the effect of the revocation in her deposition:

Q: So, after December 20th of 1999, Mr. Winters continued to do underwriting work, but he could not sign off on underwriting proposals? Am I correct about that?
A: No, that's not the case. He could underwrite the file. But prior to mailing it out under his signature, he had to have approval from another person. But he still signed the proposals.
Q: That is what I am saying. He continued to discharge the job responsibilities of an underwriter except that the final product had to be approved by somebody else?
A: Yes.
Q: Did his job responsibilities change?
A: No.

2. Similarly, in a March 7, 2003, performance review, Gordon stated, "I have addressed per-

ters from the performance warning. However, an audit of his files would have to be completed before his underwriting authority could be restored. An external audit was performed in late March 2000 on sample files from each of the senior underwriters under Gordon's supervision. Generally, Winters performed well in the external audit. Only 30% of his files were considered "below 'Good'" and none of his files received an "unsatisfactory" rating.[3] The entire Houston DFI section received an overall evaluation score of "good." Sometime after the audit was completed, Gordon made the decision to reinstate Winters's underwriting authority.

However, Winters's underwriting authority was never reinstated. Winters, Washington, and Gordon met in early May to discuss Winters's continuing performance issues. On May 2, 2000, Gordon drafted a memo memorializing this meeting. Additionally, the memo can be properly termed as a "written performance warning." Apparently, this written performance warning was precipitated by Winters's decision to use a template, rather than a customized proposal, for a large client. Gordon asserted that part of the account was lost because Winters failed to provide a detailed proposal. In addition to highlighting specific problems with clients, Gordon listed the areas in which Winters was expected to improve. Generally, Gordon requested that Winters make the following changes by June 2, 2000: develop good working relationships with assigned producers; utilize various sales techniques; demonstrate ability to get tasks accomplished by networking within the branch; increase quality of underwriting analysis and applications and sound pricing techniques as by producer results, underwriting audits, file documentation and claims activity; and attainment of business development objectives as measured by in–force policy count, mix of business, renewal retention, and new business. If Winters did not meet the objectives, Gordon indicated that further disciplinary action could result, including possible termination.

Winters tendered his resignation on May 19, 2000 in the following letter:

> Dear Barbara:
>
> Please accept this correspondence as notice of my resignation effective June 2, 2000 (two (2) weeks from today).
>
> My association with this institution has provided me with several enriching experiences.
>
> Sincerely,
>
> /s/ Craig Winters
>
> Department of Financial Institutions

## MOTION FOR SUMMARY JUDGMENT

In his first point of error, Winters asserts the trial court erred in granting the motion for summary judgment because genuine issues of material fact existed.

■■■ A traditional motion for summary judgment is properly granted only when the movant establishes that there are no genuine issues of material fact to be decided and that he is entitled to judgment as a matter of law. *See* TEX.R. CIV. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991); *Holmstrom v. Lee*, 26 S.W.3d 526, 530 (Tex.App.-Austin 2000, no pet.). In reviewing a motion for summary judgment, we accept as true all evidence favoring the nonmovant, indulging every reasonable inference and resolving all doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d

formance issues on Craig Winters.... Craig has improved his performance."

3. The scale on which the files are judged contains four categories: very good, good, needs improvement, and unsatisfactory.

546, 548–49 (Tex.1985). A defendant seeking summary judgment must negate as a matter of law at least one element of each of the plaintiff's theories of recovery or plead and prove as a matter of law each element of an affirmative defense. *See Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). If the defendant establishes a right to summary judgment, the burden shifts to the plaintiff to present evidence raising a fact issue. *See id.*

Chapter 21 of the Labor Code prohibits an employer from refusing to hire an individual, discharging an individual, or discriminating in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment on the basis of race, color, disability, religion, sex, national origin, or age. TEX. LAB.CODE ANN. § 21.051 (Vernon 1996). The TCHRA is modeled on the federal Civil Rights Act of 1991 (Title VII); therefore, Texas courts follow federal statutes and cases in applying the TCHRA. *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex.2001); *Russo v. Smith Int'l, Inc.,* 93 S.W.3d 428, 433 (Tex. App.-Houston [14th Dist.] 2002, no pet.).

In analyzing cases brought under the TCHRA, we follow the burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] *Russo,* 93 S.W.3d at 434. Under the burden shifting analysis, the plaintiff is first required to present a prima facie case of discrimination. *Russo,* 93 S.W.3d at 434; *Gold v. Exxon Corp.,* 960 S.W.2d 378, 381 (Tex. App.-Houston [14th Dist.] 1998, no pet.). If the plaintiff is successful in demonstrating a prima facie case, the burden shifts to the defendant to produce evidence showing

a " 'legitimate, nondiscriminatory reason' for the adverse employment actions." *Gold,* 960 S.W.2d at 381 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). If the defendant succeeds in carrying his burden, the plaintiff must then prove, by a preponderance of the evidence that the defendant's reasons are merely a pretext for discrimination. *Russo,* 93 S.W.3d at 434 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Although a prima facie case is a condition precedent to the pretext analysis, the plaintiff need only make a minimal showing. *Russo,* 93 S.W.3d at 435.

### Prima Facie Case

To establish a prima facie case of employment discrimination, a plaintiff must show (1) he was a member of a protected class, (2) he suffered an adverse employment action, and (3) nonprotected class employees were not treated similarly. *Thomas v. Clayton Williams Energy, Inc.,* 2 S.W.3d 734, 739 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Chubb asserted in its motion for summary judgment that Winters could not establish his prima facie case. More specifically, Chubb argued that Winters is unable to establish that he suffered any adverse employment action or that the nonprotected class employees were not treated similarly. In the order granting summary judgment in favor of Chubb and Gordon, the court did not state the specific grounds for its ruling. Therefore, we will affirm if any of the theories advanced in defendant's motion for summary judgment are meritorious. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

---

4. We necessarily invoke the "pretext" model described by the federal courts because there is no direct evidence in the record to support

discrimination. *See Quantum,* 47 S.W.3d at 476–77.

 Title VII and Chapter 21 address ultimate employment decisions; they do not address every decision made by employers that arguably might have some tangential effect upon employment decisions. *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995); *Elgaghil v. Tarrant County Junior Coll.*, 45 S.W.3d 133, 142 (Tex.App.-Fort Worth 2000, pet.denied). Generally adverse employment decisions involve hiring, granting leave, discharging, promoting, and compensating. *See id.* Alternatively, adverse employment actions do not include "events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future." *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir.1997).[5]

 When an employee submits a letter of resignation, he may still satisfy the adverse employment action element by proving that he was constructively discharged. *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994); *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 177 (Tex.App.-Houston [14th Dist.] 1991, no writ). "A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign." *Hammond*, 821 S.W.2d at 177. In considering whether an employee acted reasonably, the Fifth Circuit has set out factors that may be considered, singly or in combination, in making its determination. The factors include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities, (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. *Barrow*, 10 F.3d at 297. In construing these elements in light of a race discrimination case, federal courts have explained that the fifth factor applies when the employee was reassigned to work under a supervisor who subjected the plaintiff to discriminatory or harassing behavior. *Machado v. Goodman*, 10 F.Supp.2d 709, 719 (S.D.Tex.1997). Additionally, the seventh factor is better characterized simply as an offer of voluntary resignation. *Id.*

We find a fact issue with regard to whether Winters was constructively discharged. Winters and Gordon present differing accounts as to what was discussed at the meeting on May 2. Winters asserts in his deposition that he submitted his letter of resignation in order to avoid being terminated. He states that Gordon told him that he would not survive the thirty-day period of the written performance warning.[6] Gordon denies making such statements to Winters. She points to the documentation indicating if Winters did not improve that he *could* be terminated. Faced with this fact issue, we cannot affirm summary judgment on this ground.

---

**5.** The court distinguishes between interlocutory and final decisions. *Mattern*, 104 F.3d at 708. In analyzing Title VII case law, the Fifth Circuit explains that no adverse employment action occurs merely because there is an increased chance of discharge through documented reprimands. *See id.*

**6.** There is also conflict within Winters's own deposition testimony. At one point he states that Gordon specifically told him that he would not survive the period from May 2nd. Later in the same deposition he states, "Deanne *implied* that I would not survive this—this period." (emphasis added). A fact issue is created when a party's testimony is inconsistent. *Clifton v. Hopkins*, 107 S.W.3d 755, 759 (Tex.App.-Waco 2003, no pet.).

Chubb also asserted in its motion for summary judgment that Winters failed to produce prima facie evidence of disparate treatment. The gist of Winters's argument is that other nonblack employees exhibited similar performance problems and were not disciplined. Because we decide this case on the issue of pretext, an in-depth disparate treatment analysis will follow. Accordingly, we assume *arguendo* that Winters produced enough evidence of disparate treatment to establish his prima facie case.

### Pretext for Discrimination

Once the plaintiff has established a prima facie case, the defendant employer must articulate a nondiscriminatory reason for the adverse employment action. *Gold,* 960 S.W.2d at 381. Following the Supreme Court's holding in *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the employer bears only a burden of production, not of persuasion when tendering its nondiscriminatory reason for discharging the plaintiff. *McKinney v. Tex. Dep't Transp.,* 167 F.Supp.2d 922, 925 (N.D.Tex.2001). Chubb asserts that Gordon's decisions were based on her objective assessment of Winters's job performance. Having produced a nondiscriminatory reason, we analyze whether or not there is a fact issue on the issue of pretextual discrimination.

Proving "pretext for discrimination" requires the plaintiff to show "*both* that the reason [for termination] was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113 S.Ct. 2742. More specific to Texas, a plaintiff pursing a claim under the TCHRA must "show that discrimination was a motivating factor in an adverse employment decision." *Quantum,* 47 S.W.3d at 482. A mere scintilla of evidence will raise a fact issue.

*Walton v. Bisco Indus., Inc.,* 119 F.3d 368, 370 (5th Cir.1997) (indicating that the evidence of discrimination must be "substantial"); *McKinney,* 167 F.Supp.2d at 925; *Gold,* 960 S.W.2d at 385–86 (distinguishing the summary judgment standard under the TCHRA with Texas's conventional summary judgment standard). An employer is entitled to summary judgement "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097; *see also Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (determining the propriety of a summary judgment by viewing the evidence "as a whole"). Similarly, a TCHRA plaintiff may survive summary judgment by either establishing a fact issue with regard to pretext or challenging the employer's summary judgment evidence as failing to prove, as a matter of law, that the employer's proffered reason was a legitimate, nondiscriminatory reason for plaintiff's termination. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 24 (Tex.2000). We find that Winters could not establish either.

"[A]n employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief." *Martin v. The Kroger Co.,* 65 F.Supp.2d 516, 553 (S.D.Tex.1999); *Gold,* 960 S.W.2d at 384. Here, there is very little evidence, outside of Winters's subjective belief, to show that race was a motivating factor. Gordon did not realize that Winters was African–American until De-

cember 1999. Notwithstanding this fact, Winters describes his working relationship with Gordon between November 1997 and June 1998 as "strained" and explained that she exhibited a lot of impatience.[7] Other employees also testified that Gordon was impatient with Winters and treated him more harshly than other underwriters; however, it is difficult to find a fact issue on racial pretext when the record indicates that the working relationship between Gordon and Winters had always been less than perfect.[8]

There is no evidence to establish that Gordon generally disliked African–Americans. Winters testified that he never heard Gordon make a racially-motivated statement or use a racial epithet. Although Winters makes much of the fact that he was the only African–American senior underwriter under Gordon's supervision, Gordon hired an African–American woman as an underwriter trainee, and this trainee has since been promoted to underwriter. Finally, two customer service representatives were asked whether Winters was treated differently because of his race. Pam McNeely could only state "maybe," and Mary Post stated that it initially crossed her mind, but she did not think that race was a factor. We believe the case law requires more. *See, e.g., Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir.1988) (finding fact issue in evidence that included "comments by [plaintiff's] former supervisors that could be interpreted as carrying an age-based pejorative implication," which qualifies as *direct* evidence of discrimination); *Greathouse v. Alvin Indep. Sch. Dist.*, 17 S.W.3d 419, 425–26 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (finding fact issue based on manager's tattoo signifying African–American supremacy, comments by manager that plaintiff was a "KKK kind of guy," and comments by manager that he would do whatever it took to get rid of plaintiff); *Thomas*, 2 S.W.3d at 739 (finding fact issue based upon affidavit explicitly describing preferential treatment of whites and giving specific examples of such treatment)

▪▪▪ Winters also points to two statements in proving racial animus and pretext. First, he describes Hall's statement that he thought African–Americans struggled at Chubb and that he thought it was cultural issue. Second, Winters says that Gordon told him, "I'm going to get you, and I don't like you." Generally, a comment is probative of discrimination when it is "(1) related to the plaintiff's protected class, (2) proximate in time to the adverse employment decision, (3) made by an individual with authority over the employment decision, and (4) related to the employment decision at issue." *Elgaghil v. Tarrant County Junior Coll.*, 45 S.W.3d 133, 140 (Tex.App.-Fort Worth 2000, pet. denied). Hall's comment does not meet these criteria. Hall made the statement after an African–American trainee from another unit resigned some-

---

**7.** Winters elaborated, "Again, I think [Gordon] was very impatient for results. She was under a tremendous amount of pressure, both corporately at a national level and at the branch level. This could produce an intimidating work environment where you didn't feel comfortable approaching Ms. Gordon, and—and actually, I preferred to approach [Hall]."

**8.** Irrespective of any claims of racial animus, there is evidence that Gordon may have been a difficult person to work with. Initially, Winters went to Barbara Washington, the human resources manager, to complain about communication problems with Gordon. Although Winters criticizes Washington for taking no action, it is instructive that Washington explained to Winters that Gordon was sometimes difficult to deal with and gave him a picture of a field marshal, which was intended as a representation of Gordon's demeanor.

time before Winters submitted his letter of resignation. Further, Hall was not Winters's supervisor and did not have authority to discharge Winters. Likewise, Gordon's comment is not probative of discrimination. Most importantly, there is no indication that it was racially motivated.

■ Winters's claims of disparate treatment do not sufficiently demonstrate that he was treated differently because of his race. To establish that he received disparate treatment, Winters must demonstrate that the preferential treatment was given under "nearly identical" circumstances; more specifically, Winters must show that he was discharged for misconduct for which other employees were not. *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir.1991); *Smith v. Wal–Mart Stores*, 891 F.2d 1177, 1180 (5th Cir.1990) (demonstrating disparate treatment requires that the employees violate the same company policy); *Farrington v. Sysco Food Servs. Inc.*, 865 S.W.2d 247, 251 (Tex. App.-Houston [1st Dist.] 1993, writ denied). Winters complains that other underwriters underwrote accounts that lost money, lost accounts, and had been complained about by customers. Alternatively, Winters questioned why he was singled out in a meeting about rate modification issues, why he was the only employee to have his underwriting authority revoked, and why he was the only underwriter who had to develop a business plan. We believe the documentation indicates that Winters suffered from a unique combination of performance issues.

■ Absent a discriminatory motive, a disagreement between an employer and employee over assessment of job performance is not actionable. *Martin*, 65 F.Supp.2d at 552 (describing a decision to put an employee on probation or to terminate them as a business decision). "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir.1991). The court's role in employment discrimination cases is not to second guess every personnel decision. *Martin*, 65 F.Supp.2d at 553.

Winters exerts significant effort in refuting the documented reasons for the actions taken against him. Interestingly, Winters does not expressly deny having job performance issues; when asked whether he had performance issues, he would only admit that he was "not perfect." He does, however, provide explanations for some of the incidents that Gordon highlighted in the documentation.[9] Winters criticizes Gordon for not listening to his explanations and blowing the incidents out of proportion. He also challenges what has been characterized as alleged performance deficiencies as professional differences or differences in approach. Further, he complains about the level of scrutiny focused on his work. Winters described the errors reported in Hall's audit as "nit picky." Additionally, he states that he felt that management was "overly critical" of his work. Recalling Gordon's criticism he states, "she was giving me nothing substantive to work with where I could measure myself. Communication, your communication skills, your presentation skills—what kind of fuzzy, you know, math is that?" We are unpersuaded by Win-

---

9. For example, Winters claims that he was told by the client to use a template proposal for a large client; however, Gordon had told him to use a detailed proposal, and she disciplined Winters for his decision. Gordon later described this incident as a "professional disagreement." The Bank United Y2K issue is another example. Here, Gordon disciplined Winters for not evaluating Y2K exposure, whereas, he claims that he had done so and received approval for his actions from Gordon's supervisor.

ters's claims that the evaluations were "trumped up." *See Gold,* 960 S.W.2d at 384 (finding insufficient statements made in plaintiff's affidavit and deposition claiming improper and contrived evaluations based "upon his allegations that his supervisor made age-related remarks indicating a preference for younger employees and gave the younger employees preferential treatment").

Notwithstanding Winters's complaints of being singled out, we are unable to find sufficient evidence in the record indicating that another employee exhibited the same list of performance issues as Winters. There is some evidence that other underwriters may have committed some of the same errors as Winters; however, there is not specific evidence of another employee committing the same range of errors made by Winters.[10]

Winters attempts to bolster his disparate treatment argument by introducing evidence of his positive job performance. He introduced the testimony of three other Chubb employees, Brian Specht, Pam McNeely, and Mary Post. Winters argues that because these employees thought he was a competent underwriter that he had demonstrating more than a scintilla of evidence to rebut Chubb's allegation that Winters had exhibited continued performance issues. *See Quantum,* 47 S.W.3d at 481. However, each employment discrimination case is unique, and we must analyze "the nature, extent, and quality of the

evidence, as to whether a jury could reasonably infer discrimination." *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 903 (5th Cir.2000). The coworker testimony relates only to general opinions about his job performance. Both McNeely and Post are not underwriters; they are customer service representatives. McNeely admits that she has no experience managing underwriters and is unfamiliar with the requisite evaluation criteria. Post admits that she was "not privy to what was going on with what [Gordon's] needs and the department's needs were from [Gordon's] perspective." Specht acknowledged that he had never audited Winters's files and did not interact with him on a daily basis. Winters also refers us to the good marks that he received in the external audit. Viewing his employment record in its entirety, the positive marks are only indicative of performance during a particular period of time, and do not explain away the long list of documented performance issues. *See Crawford,* 234 F.3d at 903 (explaining that although the plaintiff's most recent evaluation was positive, the evaluation did not cover another time frame where the employment problems allegedly occurred).

Keeping in mind that the disparate treatment must occur under nearly identical circumstances, we find the evidence of disparate treatment presented here fails to rebut Chubb's nondiscriminatory explana-

---

**10.** Although we believe the lack of any evidence establishing race as the basis for Gordon's decision to discipline Winters forecloses the possibility that a fact issue exists with regard to racial prejudice, Winters's attempt at establishing a case of disparate treatment also has flaws. Winters questions why other employees were not disciplined or reprimanded for their mistakes. However, several of these employees may not be considered in the disparate treatment analysis because the alleged preferential treatment did not occur un-

der nearly identical circumstances. First, Brian Specht cannot be used in a disparate employee analysis because he did not report directly to Gordon. *Little,* 924 F.2d at 97 (finding that plaintiff and coworker could not meet the "nearly identical circumstances" test because each did not report to the same supervisor). Second, Lewis Hall's negative performance evaluation as the Department manager cannot be considered because Hall was serving as Winters's supervisor.

tion. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091–92 (5th Cir.1995); *see also McKinney*, 167 F.Supp.2d at 932 (requiring specific instances of preferential treatment). Accordingly, we overrule Winters' first point of error.

## ATTORNEY FEES

In his second point of error, Winters claims the trial court erred in granting Gordon attorney fees when it granted her partial motion for summary judgment. In a suit brought under the TCHRA the "court *may* allow the prevailing party ... a reasonable attorney's fee as part of the costs." TEX. LAB.CODE ANN. § 21.259 (Vernon 1996) (emphasis added). We review the award of attorney fees under an abuse of discretion standard. *Greathouse v. Glidden*, 40 S.W.3d 560, 571 (Tex.App.-Houston [14th Dist.] 2001, no pet.). A trial court "abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985).

Winters asserts multiple grounds in his brief and reply brief in challenging the trial court's award of attorney fees. He first argues the court improperly awarded attorney fees on plaintiff's defamation case. He argues this is error because attorney fees are not recoverable in tort actions and there was no finding of bad faith under Rule 13. Later, in his reply brief, Winters asserts that he did not sue Gordon for discrimination, but only for defamation and fraud. Alternatively, Winters argues that the award of attorney fees was in error because there was no finding by the court that his discrimination suit was "frivolous, unreasonable, or groundless." We do not find any of these arguments persuasive.

Winters's first arguments are not supported by the record. Winters names both Chubb and Gordon as defendants in his petition. Further, in alleging his TCHRA cause of action, Winters refers to the actions of *defendants*. A plain reading of the petition reveals that he was pursuing both defendants in the discrimination, intentional infliction of emotional distress, and defamation causes of action. Interestingly, he specifically names Gordon, omitting Chubb, in alleging his fraud cause of action. Likewise, Winters' attempt to invoke Rule 13 is also misguided. There is nothing in the record, *i.e.*, a motion for sanctions, to indicate that the attorney fees were intended as a sanction.

Relying on the federal standard applied in Title VII cases, Winters also argues that the trial court made no such finding, and the order granting summary judgment does not state that the claim was "frivolous, unreasonable, or groundless." Other courts of appeals that have addressed attorney fees in TCHRA cases have followed the federal standard, wherein an employer may recover attorney fees if the plaintiff's claims "were frivolous, meritless, or unreasonable, or the plaintiff continued to litigate after it became clear that his claim was frivolous." *Elgaghil*, 45 S.W.3d at 144–45. However, findings of fact are not required in an abuse of discretion review. *Crouch v. Tenneco, Inc.*, 853 S.W.2d 643, 646 (Tex.App.-Waco 1993, writ denied). In the absence of findings of fact, a trial court's judgment implies all necessary facts required to support it. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990). It is well established in Texas that an individual cannot be held personally liable under the TCHRA. *DeMoranville v. Specialty Retailers, Inc.*, 909 S.W.2d 90, 94 (Tex.App.-Houston [14th Dist.] 1995) *rev'd in part on other grounds*, 933 S.W.2d 490 (Tex.1996). Because Winters' discrimination suit against Gordon was without mer-

it, we find the trial court did not abuse its discretion in awarding attorney fees to Gordon.

Winters' second point of error is overruled, and the judgment of the trial court is affirmed.