# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00653-CV

**Conrad G. Deocariza, Appellant**

**v.**

**Central Texas College District, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT NO. 202,752-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Conrad Deocariza sued his former employer, Central Texas College District ("CTCD"), alleging that he was denied a promotion and later terminated because he is a Pacific Islander, *see* Tex. Lab. Code Ann. § 21.051 (West 2005), and that he was terminated in retaliation for complaining about discrimination in the promotion. *Id.* § 21.055 (West 2005). CTCD sought summary judgment on traditional and "no evidence" grounds challenging various elements of Deocariza's discrimination and retaliation claims. CTCD also asserted that limitations barred Deocariza's claims and that the after-acquired evidence doctrine precluded the remedies of reinstatement and front pay and limited any back pay award to the period between February 14, 2004, (the date he was terminated) and October 12, 2004, (the date CTCD learned through discovery that

Deocariza had past employment problems that he had not disclosed on his CTCD job applications).[1]

The district court granted summary judgment in favor of CTCD without specifying the grounds on which it relied. Deocariza appeals.

Deocariza does not dispute that partial summary judgment was appropriate under the after-acquired evidence doctrine but contends that fact issues preclude summary judgment as to his surviving claim for back-pay damages for the period between February 14 and October 12, 2003. We disagree, and will affirm the district court's judgment.

**STANDARD OF REVIEW**

Under the "traditional" standard, a summary-judgment motion is properly granted only when the movant establishes that there are no genuine issues of material fact to be decided and that he is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). In reviewing a motion for summary judgment, we accept as true all evidence favoring the nonmovant, indulging every reasonable inference and resolving all doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). A defendant moving for summary judgment must negate as a matter of law at least one element of each of the plaintiff's theories of recovery or plead and prove as a matter

---

[1] *See Trico Techs. Corp v. Montiel*, 949 S.W.2d 308, 309-10 (Tex. 1997). Deocariza acknowledged during his deposition that he had been charged with sexually molesting two teenagers in California, leading to that state's revocation of his teaching certificate; that he had been fired from a job in Nebraska for allegedly watching pornographic images on a work computer; that he had resigned from a job at the Texas Department of Criminal Justice after being disciplined for trying to have a relationship with a parolee; and that he had been accused of inappropriately touching students while working at Killeen's Nolan Middle School.

2

of law each element of an affirmative defense. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). If the defendant meets this burden, the burden shifts to the plaintiff to present evidence raising a fact issue. *See id.*

A "no-evidence" summary judgment is essentially a pre-trial directed verdict and an appellate court applies the same legal sufficiency standard in reviewing a no evidence summary judgment. *See* Tex. R. Civ. P. 166a(i); *Rocha v. Faltys*, 69 S.W.3d 315, 320 (Tex. App.—Austin 2002, no pet.). The appellate court views the evidence in the light most favorable to the non-moving party, disregarding all contrary evidence and inferences. *Id.* A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is not more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Harmer*, 953 S.W.2d 706, 711 (Tex. 1997). More than a mere scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise of suspicion. *Moore*, 981 S.W.2d at 269.

Because the trial court granted CTCD's motion without specifying the grounds, the summary judgment will be upheld if any of the theories advanced by CTCD are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

3

**EMPLOYMENT DISCRIMINATION CLAIMS**

Chapter 21 of the labor code prohibits an employer from refusing to hire an individual, discharging an individual, or discriminating in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment on the basis of race, color, disability, religion, sex, national origin, or age. Tex. Lab. Code Ann. § 21.051. The TCHRA is modeled on the federal Civil Rights Act of 1991; therefore, Texas courts follow federal statutes and cases in applying the TCHRA. *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001); *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 574 (Tex. App.—Houston [14th Dist.] 2004, no pet.). "In discrimination cases that have not been fully tried on the merits, we apply the burden-shifting analysis established by the United States Supreme Court." *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).

Under the burden shifting analysis, the plaintiff is first required to present a prima facie case of discrimination. *Winters*, 132 S.W.3d at 574. To establish a prima facie case of employment discrimination based on race, the plaintiff must show that: (1) he was a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) non-protected class employees were not treated similarly. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Winters*, 132 S.W.3d at 574. The plaintiff's burden of establishing a prima facie case "is not onerous." *Burdine*, 450 U.S. at 253. If established, the burden shifts to the

4

employer to "articulate some legitimate, nondiscriminatory reason" for the unequal treatment. *McDonnell Douglas Corp.*, 411 U.S. at 802. The employer's offer of a legitimate reason eliminates the presumption of discrimination created by the plaintiff's prima facie showing. *Burdine*, 450 U.S. at 254. At this point, the burden shifts back to the plaintiff to show either (1) the employer's stated reason was not true, but a pretext for discrimination; or (2) the employer's stated reason, while true, is only one of the reasons for the conduct and another "motivating factor" is the plaintiff's protected characteristic. *See Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004).

As noted, Deocariza alleged that he was both denied a promotion and later terminated on the basis of his race or national origin—specifically, because he is a Pacific Islander. In its summary-judgment motion, CTCD asserted no-evidence challenges to two elements of Deocariza's prima facie case in regard to the promotion: (1) whether Deocariza was qualified for the position to which he sought promotion; and (2) whether CTCD gave preferential treatment to employees outside the protected class. CTCD similarly challenged the same two elements of Deocariza's prima facie case in regard to his termination. Furthermore, as to both the failure-to-promote and termination claims, CTCD asserted, under the traditional summary-judgment standard, that it had conclusively established legitimate non-discriminatory reasons for its actions.

With the foregoing issues and standards in mind, we turn to the summary-judgment record. It establishes that Deocariza worked for CTCD as a part-time instructor at its Fort Hood campus from June 2001 until September 2002, at which point he was hired to be a student coordinator at CTCD's Gatesville campus. It was from the latter position that Deocariza was eventually terminated in February 2003.

5

In approximately July 2002, Deocariza was working as a part-time instructor at CTCD's Fort Hood campus in the college's Basic Skills Education Program (BSEP). He applied for a full-time teaching position in the program. Several other candidates also applied for the position, including John Ingram and James Waters—both Caucasian males—and Marcus Harris, an African-American male. Deocariza was the only applicant who was a Pacific Islander. On July 30, 2002, Deocariza received a memorandum from Christy Garner, the director of the BSEP Program, informing him that he had not been selected to interview for the position. The following day, Deocariza complained about the decision not to grant him an interview to Garner and to Leo Welsh, "Director, Human Resource Management." On July 31, Deocariza received a second memorandum from Garner inviting him to interview for the position.

The interview took place on August 1, 2002, and was conducted by four members of the selection committee. All four were Caucasian males. Six days after the interview, Deocariza was informed that Harris, the African-American candidate, had been chosen for the position. Dissatisfied with the decision to hire Harris, Deocariza submitted a written grievance with CTCD on September 19, 2002. In it, he stated that he believed he had "been clearly discriminated against based on Ethnicity, Origin and by Association." He asserted that when he complained to Garner after his initial exclusion from the pool of interviewees, she told him that his "educational background did not meet the requirements for the position." He then listed his qualifications, which according to him, include eighteen years teaching experience in both public and private institutions, a Bachelor of Science degree in Education, a Masters Degree in Health Care Administration and 38 units towards a Masters of Arts in Education. He added, "I am also tri-lingual in Pilipino,

6

Spanish, and English. I am a military veteran and am presently in the reserves as [a] Medical Services Corps officer.[] I could not understand how I was not qualified for this teaching position."

After noting that he was given the opportunity to interview after complaining to Garner and Welsh, he then suggested that the interviewers were biased in favor of Harris. He stated:

> [P]rior to the interview I asked Mrs. Garner if she will be one of the interviewers, and she responded "No," as this would be bias on her part. Unfortunately for me the interviewers were the "associates" of Mr. Harris. Mr. Harris works part time in the NCO Leadership School which is where the interviewers were from.

Deocariza also intimated that he was more qualified for the position than Harris, who Deocariza alleged "does not have a degree in education and does not have 18 years experience in the teaching field" and "has worked with CTC[D] less than six months."

The day after he filed his grievance, Deocariza met with the dean of CTCD's Fort Hood campus, James C. Nixon. Nixon documented his account of their discussion in a memo addressed to Deocariza dated September 23, 2002. In his deposition, Deocariza testified that this memo reflects an accurate account of his conversation with Nixon. In the memo, Nixon stated that he and Deocariza "discussed in depth the fact that being qualified for a position does not mean that the position will be offered to you since everyone who is considered to fill an open position is qualified. The final selection is made using a two-part system of evaluation and interview." Nixon stated that he asked Deocariza if he (Deocariza) "really believed that the selection committee agreed to purposefully and methodically disqualify the white applicants and award the position to the black applicant" and that Deocariza responded that "such a scenario was not probable and would be hard

to prove." Nixon stated that Deocariza indicated that he (Deocariza) "felt that members of the selection committee were friends of the selected employee."

Nixon further recounted that he inquired as to what action would assure Deocariza that Deocariza's grievance had "been properly explored." Deocariza replied that, because the full-time instructor position was in a higher pay range than his current position, he wanted assurance that he would be given the next job that became available within the pay range of the full-time instructor position. Nixon responded "I can assure you that will not happen. You will be fairly considered for any position for which you apply and that's the only assurance you will be given." Nixon concluded that he and Deocariza agreed that Nixon would reexamine the selection documents, interview the selection committee, "and confirm that proper procedure was followed in the selection process."

In a memo dated September 30, 2002, Nixon informed Welsh that he had met with Deocariza to discuss the grievance. Nixon stated that he

> reviewed the complete process to include a review of the scoring documents and their results. Further I met with members of the interview committee to explore the claim that the interviewers were associates of the candidate that had been selected for the position in question. After a very thorough discussion with the committee members I am convinced that the claim of "association" is without merit.
>
> After completing my review of the scoring process and the interview process I have concluded that there are no grounds for grievance.

Nixon observed that, in his view, Deocariza "does not fully understand the selection process"—believing that "since he meets the qualifications for the position, it should be awarded to him"—and that Deocariza "fails to acknowledge the qualifications of other applicants." Nixon

8

concluded that Deocariza "did a poor job of presenting himself in the written portion of the evaluation, and did not interview very well." In sum, Nixon found that "the entire selection process was conducted in strict adherence to published policy." He added, "I can find nothing to substantiate Mr. Deocariza's claim of discrimination."

After applying for and not receiving the full-time instructor position at the Fort Hood campus, Deocariza applied for a Student Services Coordinator position at CTCD's Gatesville campus. He was hired for this position on September 3, 2002. On January 4, 2003, Deocariza's supervisor, Lisa Steele, filled out an employee performance appraisal evaluating Deocariza's performance during his four month "initial training" period. The appraisal form required the appraiser to evaluate the employee's performance on six elements: "Job Knowledge," "Quality of Work," "Quantity of Work," "Initiative," "Dependability," and "Supports Institutional Policies." For each element the appraiser was to rate the employee on a scale of 1 to 5; where 1 equaled "Unsatisfactory," 2— "Marginal," 3—"Satisfactory," 4— "Above Average," and 5—"Outstanding." The employee was given an "Overall Evaluation" ranging from "Unsatisfactory" to "Outstanding" based on the total of the six scores. Steel rated Deocariza's "Job Knowledge" as "Marginal"; his "Quantity of Work," "Initiative," and "Dependability" as "Satisfactory"; and his support of "Institutional Policies" as "Above Average." Totaling these six scores, Steele rated Deocariza's "Overall Evaluation" as "Satisfactory." In the "Comments" section of the evaluation Steele wrote: "Mr. Deocariza comes to work on time, does not hesitate to work late and has a happy disposition. He has been diligent in trying to learn the many aspects of his job. He will ask for help when confronted with a new situation and is quick to correct errors."

9

Under the heading "Signature of Rater and Date," the performance appraisal is signed "Lisa S. Steele" and dated January 4, 2003. Deocariza signed the appraisal on a line marked "signature of employee" and wrote "Jan. 4, 2003" above a line marked "Date discussed with Employee."

On January 22, 2003, Dean Nixon sent a memo to Steele stating that he had received Deocariza's performance appraisal and could not "accept it in its current form." He explained:

> Specifically, I will need clarification in the areas of Job Knowledge, and Quality of Work. In the area of Job Knowledge you have assigned a numerical score of "2" which is a marginal rating, but you have not addressed Mr. Deocariza's Job Knowledge in your narrative. Secondly, I cannot understand how Mr. Deocariza's Job Knowledge can be rated marginal with a satisfactory rating in Quality of Work. Please resolve this inconsistency.
>
> In your scoring and narrative please be thorough and specific. If necessary you may attach comments to the appraisal form. Dates for the appraisal will remain the same as the original appraisal.

After receiving Nixon's memo, Steele amended Deocariza's performance appraisal. Specifically, she changed Deocariza's "Job Knowledge" and "Quality of Work" ratings to "Unsatisfactory" and his "Initiative" and "Dependability" ratings to "Marginal." Based on the new total score, she changed the "Overall Evaluation" rating to "Marginal." Steele also attached a typed three page single-spaced "Evaluation Narrative," in which she gave numerous examples of problems that she had encountered with Deocariza's job performance. Some of the problems she described include:

• incorrectly alphabetizing student schedules and misfiling student transcripts;

10

- mistakenly sending a letter to a student stating that the school had received the student's transcript when in fact the school had not;

- making mistakes when reading testing instructions to students, "such as the testing location code, the codes for where to send scores, etc.";

- difficulty using the office computer system to check educational information on students, despite the fact that "everyone in the office" had shown him how to use it, and that there were written directions on a piece of paper under the keyboard;

- delivering paperwork to the wrong offices and forgetting things that he was supposed to pick up; and

- making mistakes when registering students for classes such as signing up a student for two classes that met at the same time of day, not filling out the registration form correctly, or not printing out a student data form for a student.

Steele concluded:

There have been many other instances similar to the ones I have related. In my opinion [Deocariza] has very good intentions, and he wants to be successful at his job duties. However, he is not making acceptable progress in learning his duties, and I don't feel confident leaving him to perform his many duties unassisted. After four months, I am still doing about half his job . . . .

On January 28, 2003, Dean Nixon sent a memo to Welsh stating that he reviewed Deocariza's performance appraisal and had "adjusted the evaluation from Marginal to Unsatisfactory." Dean Nixon explained:

This adjustment is based on a thorough and careful assessment of Mr. Deocariza's performance during the appraisal period. The raters comments and a brief interview with Mr. Deocariza indicate to me that he is not capable of performing the duties prescribed to his position. I am particularly concerned that his supervisor has no confidence in his ability to perform his duties and finds it necessary to do the work herself. Mr. Deocariza has not demonstrated that he can work efficiently and accurately without extensive supervision and assistance. To allow him to take over

11

the duties and responsibilities as Coordinator of Student Services at the Gatesville site would result in a degradation of service, and have a negative impact on our program there.

Accordingly I am adjusting his performance appraisal to reflect a rating of Unsatisfactory and recommending that he be terminated.

Deocariza's employment with CTCD was terminated effective February 14, 2003, the end of his initial training probationary period.

We turn first to Deocariza's claim of discrimination in failing to promote him to the full-time instructor position in July 2002. Whether or not Deocariza made out a prima facie case of discrimination, we agree with CTCD that it has established its entitlement to summary judgment with regard to legitimate nondiscriminatory reasons for its hiring decision. The undisputed summary judgment evidence shows that Dean Nixon investigated the entire selection process and found that it "was conducted in strict adherence to published policy." Nixon concluded that Deocariza was not selected for the position because he "did a poor job of presenting himself in the written portion of the evaluation, and did not interview very well." Deocariza has not pointed to any evidence in the record showing that these legitimate nondiscriminatory explanations were pretextual or that race was a motivating factor in the decision.

During his deposition, Deocariza explained that he believed he did not get the full-time instructor position because he "was the only Pacific Islander working at CTC[D] during the time" or "on that capacity, in that level." When questioned, he was unable to point to anything more than a personal, subjective belief that he was not promoted because he was a Pacific Islander. This is insufficient as a matter of law to create a fact issue about whether CTCD's legitimate

12

non-discriminatory reason for not hiring him is pretextual. *See M. D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 25 (Tex. 2000). It is also insufficient to create a fact issue about whether race was a motivating factor in the decision. *See Herbert v. City of Forest Hill*, 189 S.W.3d 369, 375 (Tex. App.—Fort Worth 2006, no pet.).

As for Deocariza's claim that his race or national origin played a role in the decision to terminate him from the student coordinator position, we agree with CTCD that Deocariza did not raise a fact issue with regard to whether CTCD gave preferential treatment to employees outside Deocariza's protected class, an element of his prima facie case. *See Winters*, 132 S.W.3d at 574. Even if Deocariza had overcome this hurdle, we further conclude that CTCD established its entitlement to summary judgment regarding legitimate nondiscriminatory reasons for terminating him. Nixon stated that he could not accept Steele's original appraisal of Deocariza's job performance because there were inconsistencies in the scores and deficiencies in the narrative. Nixon stated that he lowered Deocariza's performance appraisal to "Unsatisfactory" and recommended that Deocariza be terminated because the "raters comments and a brief interview with Mr. Deocariza indicate[d] to me that he is not capable of performing the duties prescribed to his position." Specifically, Nixon stated that "allow[ing] Deocariza to take over the duties and responsibilities as Coordinator of Student Services at the Gatesville site would result in a degradation of service, and have a negative impact on our program there."

Deocariza has not pointed to any evidence to show that Nixon's legitimate non-discriminatory reasons for instructing Steel to revise her performance appraisal and for ultimately changing the performance appraisal to "Unsatisfactory" and recommending Deocariza's termination

were pretextual or that race was a motivating factor. Although Deocariza either denied or stated that he did not recall many of the job performance problems that Steele documented in her narrative evaluation, he agreed that Steele was a truthful and honest person, and he has not pointed us to any evidence creating a fact issue that Steele's complaints about his job performance were pretextual or motivated by race. Unless there is evidence of a discriminatory motive, "a disagreement between an employer and employee over assessment of job performance is not actionable." *Winters*, 132 S.W.3d at 578. "Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason." *Id.* (quoting *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991)). It is not our role in an employment discrimination case "to second guess every personnel decision." *Id.* Furthermore, negative employment evaluations are not considered actionable adverse actions. *Id*. at 575.

We conclude that the district court did not err in granting summary judgment on Deocariza's claims that CTCD discriminated against him on the basis of race or national origin.


## RETALIATION CLAIM

Under section 21.055 of the labor code, an employer commits an unlawful employment practice if the employer "retaliates or discriminates against" an employee who "(1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." Tex. Lab. Code Ann. § 21.055. To establish a prima facie case of retaliation, an employee must show that: (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed

between the protected activity and the adverse employment action. *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002); *Marsaglia v. University of Tex., El Paso*, 22 S.W.3d 1, 4 (Tex. App.— El Paso 1999, pet. denied). Once an employee establishes a prima facie case of retaliation, the burden shifts to the employer, who must rebut the alleged retaliation by showing that there was a legitimate, non-retaliatory reason for the adverse action. *La Tier v. Compaq Computer Corp.*, 123 S.W.3d 557, 561 (Tex. App.—San Antonio 2003, no pet.). If a non-retaliatory reason for the adverse action is established, the burden shifts back to the employee to present evidence raising a fact issue that without or "but for" the employee's protected activity, the employer's adverse employment action would not have occurred when it did. *Pineda v. United Parcel Serv. Inc.*, 360 F.3d 483, 488-89 (5th Cir. 2004).[2]

Deocariza asserts that CTCD retaliated against him for his September 2002 "Grievance" with CTCD or for filing a charge of discrimination with the Texas Commission on Human Rights in October 2002. He points to the fact that his evaluations were changed during January 2003 and that he was eventually fired in February. CTCD sought summary judgment on grounds that there is no evidence of a causal connection between any protected activity and any adverse employment action, that employment evaluations are not actionable adverse employment actions, and that CTCD had established legitimate non-retaliatory reasons for terminating Deocariza.

First, we again note that negative performance evaluations are not actionable adverse employment actions. *Winters*, 132 S.W.3d at 575. Furthermore, whether or not Deocariza established

---

[2] We disagree with Deocariza's assertions that the "motivating factor" causation standard applies to retaliation claims. *See Pineda v. United Parcel Serv. Inc.*, 360 F.3d 483, 488-89 (5th Cir. 2004).

a prima facie case of retaliation based on his termination, CTCD has offered legitimate, non-retaliatory reasons for terminating Deocariza. Deocariza has not pointed to anything in the record to show that CTCD's proffered reasons were pretextual and that had Deocariza not filed a grievance with CTCD and a charge of discrimination with the Commission, he would not have received the negative employment evaluations and been terminated from the position. In short, there is nothing in the record to suggest that CTCD's actions were undertaken to retaliate against Deocariza for complaining of the alleged discrimination.

Accordingly, we conclude that the district court did not err in granting summary judgment on Deocariza's retaliation claim.

## CONCLUSION

Because we conclude that the district court properly granted summary judgment as to all of Deocariza's claims on the grounds discussed above, we need not address the limitations ground presented in CTCD's summary judgment motion. We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   June 19, 2008