Affirmed and Opinion filed July 14, 2005









Affirmed
and Opinion filed July 14, 2005.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00258-CV

____________

 

CEASAR DAVIS, JR., AS
ATTORNEY-IN-FACT FOR HIS MOTHER, 

AUDREY
DAVIS,
Appellant

 

V.

 

SPRING BRANCH MEDICAL CENTER, INC., Appellee

____________

 

NO. 14-04-00927-CV

____________

 

CEASAR DAVIS, JR., AS
ATTORNEY-IN-FACT FOR HIS MOTHER, 

AUDREY DAVIS, Appellant

 

V.

 

MODERN HEALTH SYSTEMS, INC. d/b/a/
HIGHLAND PARK CARE CENTER, Appellee

 



 

On Appeal from the 215th District
Court

Harris County, Texas

Trial Court Cause No. 03-30218

 



 

O P I N I O N

 








In this case, brought under the former
Medical Liability and Insurance Improvement Act (AMLIIA@),[1]
appellant, Ceasar Davis, Jr., as attorney-in-fact for his mother, Audrey Davis,
sued appellees Spring Branch Medical Center, Inc. (Athe hospital@), and Modern
Health Systems, Inc. (Athe nursing home@).[2]  On appeal, Davis challenges the trial court=s orders (1)
granting appellees= motions to dismiss Davis=s claims with
prejudice because he failed to file adequate expert reports as required by the
MLIIA, (2) denying his requests for a thirty-day grace period in which to file
conforming expert reports, and (3) declining to enter findings of fact and
conclusions of law.  We affirm.

I.  Procedural Background

On May 29, 2003, Davis sued the hospital
and the nursing home based on their treatment of his mother, Audrey Davis, from
primarily mid-November 2001 through late April 2002.[3]  During that time, Audrey Davis developed
pressure ulcers on both feet and ultimately had to have both legs amputated
above the knees.  In the lawsuit, Davis
asserted claims of negligence, gross negligence, and malice against the
hospital; and claims of negligence, negligence per se (violation of regulations
and statutes and injury to an elderly person), negligent hiring, gross
negligence, and malice against the nursing home.[4]








Under the MLIIA, Davis=s 180-day period
for furnishing expert reports to the hospital and the nursing home expired
November 25, 2003.[5]  On August 25, 2003, Davis filed and served
the expert report and curriculum vitae of Dr. Donald M. Gibson.  On September 8, 2003, he filed and served the
expert report and curriculum vitae of Dr. J.R. Steinbauer. 

On January 27, 2004, the hospital filed a
motion to dismiss Davis=s claims with prejudice on the ground the
expert reports were inadequate.  Davis
responded, arguing both Gibson=s and Steinbauer=s reports met the
statutory requirements.  In the alternative,
he requested a thirty-day grace period within which to file additional reports
if the court determined the reports on file were inadequate.  As grounds for the extension, Davis alleged
he had experienced difficulty obtaining Amedical records
and complete nursing home records@, including color
photographs of Audrey Davis=s ulcers.  

The trial court heard the hospital=s motion and Davis=s request on
February 19, 2004.  Counsel for Davis and
for the hospital testified regarding when various documents were provided.  Davis=s counsel stated
that, with the exception of the color photographs, she received complete
hospital records on October 10, 2003. 
The hospital=s counsel testified, without objection, he
had been informed by his office that Davis=s counsel received
black and white photographs, which were part of the medical chart, in April
2003, and would certainly have had these photographs by October 19, 2003.  Further, it was his understanding that Davis=s counsel received
the color photographs from the hospital on November 21, 2003.








In addition to this testimony, the court
admitted into evidence the two reports, the color photographs, documents
reflecting Davis=s requests for records, and the hospital=s responses.[6]  The documents included the hospital=s November 20,
2003 discovery response, to which color photographs were attached, and a
certified mail receipt indicating receipt by Davis=s counsel=s office on
November 21, 2003.

By written order entered February 20,
2004, the trial court granted the hospital=s motion to
dismiss and denied Davis=s request for a thirty-day grace
period.  The order reads in part:

The court finds that the failure of
plaintiff to file an adequate report was not the result of accident or
mistake.  Accordingly, the court hereby
denies the plaintiff=s motion for grace period.  Similarly, the court hereby grants the
defendant=s motion to dismiss for failure to
provide an expert report that satisfies the statutory requirements.

 

Davis then requested the trial court enter
findings of fact and conclusions of law. 
By written order entered March 15, 2004, the court declined to do so,
stating it was not required to do so under the MLIIA, the Texas Rules of Civil
Procedure, or any applicable case law. 
On March 17, 2004, Davis filed a notice of appeal from the February 20,
2004 order.[7]

The nursing home also filed a motion to
dismiss on the ground the expert reports were inadequate.[8]  Davis responded to the nursing home=s motion, relying
only on Steinbauer=s report. 
Davis again requested, in the alternative, a thirty-day grace period
within which to file additional reports if the court were to find Steinbauer=s report
inadequate.  As before, he alleged he had
experienced difficulty obtaining complete medical and nursing home records,
including color photographs of Audrey Davis=s ulcers.  He specifically alleged he did not receive
the color photographs from the nursing home until February 12, 2004, after he
had to invoke the court=s power to compel.








The trial court heard the nursing home=s motion and Davis=s request on July
1, 2004.  The trial court admitted the
expert reports, the color photographs, the corresponding black and white
copies, and documents reflecting correspondence between Davis and the hospital
and nursing home.  In addition, the trial
court heard testimony from Davis=s counsel.

Davis=s counsel
testified she began requesting records from the nursing home in May 2002.  When the nursing home had not provided
records by July 2002, counsel reported the nursing home to the Texas Department
of Human Services (TDHS), and TDHS conducted an investigation in September
2002.  By September 9, 2002, counsel had
received a 550-page document, for which the family paid a dollar per page.  According to its investigation report, TDHS
found the nursing home violated regulations providing for a patient=s right to
purchase photo copies at a rate not exceeding community standards.

Counsel testified further that, on March
11, 2003, she again wrote the nursing home. 
In that letter counsel stated, ANo photographs
were included with the records we received regarding Audrey Davis.  Would you please forward copies of the
photographs in Mrs. Davis= [sic] records, in color, as soon as
possible.@  On
November 21, 2003, the trial court ordered the nursing home to produce
documents on December 3, 2003.  Counsel
testified they went to the nursing home that day, but the color photographs
were not copied at that time.  Counsel
testified that, on February 10, 2004, she again requested color copies of the
photographs.[9]  According to counsel, she received color
photographs from the nursing home on February 12, 2004, in response to a second
motion to compel.  On cross-examination,
counsel admitted that Athere was no extension of time to file any
further expert reports in this case after the 180-day time period furnishing
[sic] an adequate report expired until [she] filed the response to [the nursing
home=s] motion to
dismiss.@








By written order entered July 29, 2004,
the trial court granted the nursing home=s motion to
dismiss and denied Davis=s request for a thirty-day grace
period.  The order was substantively
identical to that previously entered in Davis=s case against the
hospital.  Davis again requested findings
of fact and conclusions of law, and on September 17, 2004, filed a notice of
appeal in his case against the nursing home.

This court subsequently granted Davis=s motion to
consolidate the two cases for purposes of appeal.  In both cases, Davis contends the trial court
Acommitted
reversible error@ by (1) granting the appellees= motions to
dismiss because the expert reports were insufficient to meet the requirements
of the MLIIA, (2) denying Davis=s requests for a
thirty-day grace period in which to file sufficient reports, and (3) declining
to prepare and file findings of fact and conclusions of law.

II.  Discussion

A.      The
Insufficiency of the Expert Reports








In issue one, Davis contends the trial
court Aerred@ in dismissing his
lawsuits on the ground that his expert reports did not meet the requisite
standards of the MLIIA.  Under former
MLIIA section 10.01(d), not later than the 180th day after filing suit or the
last day of any extended period under subsection (f) or (h), a health care
liability claimant who wished to pursue a claim was required to furnish an
expert report for each physician or health care provider against whom he
asserted a claim.   Act of May 5, 1995,
74th Leg., R.S., ch. 140,  ' 1, sec. 13.01
(d), 1995 Tex. Gen. Laws 985, 986, repealed by Act of June 2, 2003, 78th
Leg., R.S. ch. 204, ' 10.09, 2003 Tex. Gen. Laws 847, 884.  Subsection (e) provided that, if the claimant failed to
comply with subsection (d) within the time allowed, the court should, on the
defendant=s motion, enter an order dismissing
the claim with prejudice as a sanction against the claimant.  Id. sec. 13.01(e), 1995 Tex. Gen. Laws
at 986.  Under subsection (l), a
defendant could challenge the adequacy of a timely filed report, and the trial
court was to grant the motion only if it appeared to the court, after a
hearing, that the report did not represent a good faith effort to comply with
the definition of an expert report set out in subsection section (r)(6).  Id. sec. 13.01(l), 1995 Tex.
Gen. Laws at 987.

We apply an abuse-of-discretion standard
in reviewing a trial court=s decision to
dismiss a claim under subsections (d), (e) and (l) on the ground of an
inadequate report.  See Bowie Mem=l Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002); Am. Transitional
Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875, 878 (Tex.
2001).  A trial court abuses its
discretion if it acts in an arbitrary or unreasonable manner without reference
to any guiding rules or principles.  Wright,
79 S.W.3d at 52 (citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d
238, 241B42 (Tex.
1985)).  When reviewing matters committed
to the trial court=s discretion, we may not substitute our
own judgment for the trial court=s judgment.  Id. (citing Flores v. Fourth Court
of Appeals, 777 S.W.2d 38, 41 (Tex. 1989)).

The MLIIA defined an Aexpert report@ as 

a written report by an expert that provides a fair
summary of the expert=s opinions as of the date of the report regarding
applicable standards of care, the manner in which the care rendered by the
physician or health care provider failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages claimed.

 

Act of May 5, 1995, 74th Leg., R.S., ch. 140,  ' 1, sec. 13.01(r)(6), 1995 Tex. Gen.
Laws 985, 987 (repealed 2003).  Accordingly,
the expert report has to set out, in nonconclusory language, the expert=s opinions about
three elements of the claim:  the
standard of care, breach, and causation. 
See Palacios, 46 S.W.3d at 879.








Although the report need not marshal all
the plaintiff=s proof, it must fulfill two purposes in
order to constitute a good faith effort under subsection (l).  Id. at 878B89.  First, it must inform the defendant of the
specific conduct the plaintiff calls into question; and second, it must provide
the trial court with a basis to conclude the plaintiff=s claims have
merit.  Id.  A report merely stating the expert=s
conclusions,  or one omitting any of the
statutory requirements, does not constitute a good faith effort.  Id. at 879.  Finally, the report itself must include the
required information within its four corners. 
Wright, 79 S.W.3d at 53; Palacios, 46 S.W.3d at 878.

The hospital.  In responding to the hospital=s motion, Davis
relied on both Steinbauer=s and Gibson=s reports.  The only comment Steinbauer makes regarding
the hospital is the following:  AWhen the patient
was in Spring Branch Medical Center, her tube feedings were done by
intermittent bolus.@

Gibson sets forth the chronology of Audrey
Davis=s stays at the
hospital and nursing home from October 1, 2001, through April 29, 2002.  He indicates that, during her first stay at
the hospital, Ashe had gone from having no decubitus
ulcer to a stage four decubitus ulcer to the right heel that was 6 cm. by 5 cm.
and also had a stage one ulcer to the left heel.@  His only statement regarding the standard of
care is the following:

From my reading of this case, I
would have concerns about the standard of care that the patient received at
both the nursing home and Spring Branch Hospital.  In my opinion the possibility exists that
they both fell below the standard of care a patient should have received in a
situation such as Ms. Davis= [sic].

 

The standard of care for a hospital is
what an ordinarily prudent hospital would do under the same or similar
circumstances.  Palacios, 46
S.W.3d at 880.  A fair summary of the
standard of care must set out what care was expected, but not given.  Id. 
In Palacios, the supreme court held that a statement that
precautions were not taken to prevent a patient=s fall was not a statement
of the standard of care.  Id.  Gibson=s statement
regarding the standard of care in the present case is even less informative
than that provided by the expert in Palacios.








As in Palacios, we hold the trial
court did not abuse its discretion when it concluded the expert reports
relating to the hospital did not represent a good faith effort to meet the
requirements of the MLIIA.  See id.
at 875.

The nursing home.  In responding to the nursing home=s motion, Davis
relied only on Steinbauer=s report.[10]  Other than a list of Steinbauer=s qualifications
and the documents he reviewed, Steinbauer=s report, in its
entirety consists of the following:

I understand that Ms. Davis= [sic] family has concerns about the quality of care
she received at Highland Park. 
Specifically, when they visited her in April of 2002 and found her in
pain, without protection properly applied to her heel ulcer, and apparently not
getting enough fluid.  Within a few days
of this visit, the patient did undergo amputation of the ulcerous left leg.  This unfortunate even [sic] occurred a few
months after her right leg had been amputated.

Ms. Davis had severe vascular disease and also had
diabetes. Her diseases certainly have a poor prognosis by virtue of their
chronicity and irreversibility.  The question
becomes, did the Highland Park Nursing Center provide care that was standard
and, if not, did substandard care rob Ms. Davis of quality and quantity of life
which she would otherwise have?

Careful review of the nursing home records and
hospital records raises the following concerns:








$                  
When the patient
was in Spring Branch Medical Center, her tube feedings were done by
intermittent bolus.  Despite an order
from Dr. Skelton on 2-7-02 for the patient to receive her tube feeding every 4 hours
by bolus, nurses notes from Highland Park on 2-8-02 show the patient was
receiving a 2 hour infusion of her tube feeding.  The problem here is that Ms. Davis spent long
periods of time with the head of the bed (HOB) elevated and remaining in
bed.  This change, while making nursing
care for the tube feeding easier, makes proper positioning of the patient
difficult.  This would increase her risk
of pressure sores.  Indeed, she developed
ulcers on her left leg, and a sacral ulcer in May 2002.

$                  
Dietary notes
repeatedly mention the failure of Highland Park staff to obtain routinely
ordered weights.  Thus, the patient
struggled with malnutrition during a time when careful attention should be paid
to her nutrition status in order to give her the best chance for ulcer
healing.  Dr. Skelton ordered weekly
weights in March of 2002, and this order was also not carried out.

$                  
Dr. Skelton
ordered that the G-tube be checked for position, gastric residuals checked, and
the tube be flushed every shift.  Flow
sheet data show this was signed off at the end of a month as Aokay@, but evidence of performance every shift was lacking.

Each of these variances between what the doctor
ordered, and was [sic] actually done at Highland Park, call to question the
quality of all care provided by Highland Park. 
The errors in care I found in the record would support the observations
of the family in April 2002 when they allege they found patient in pain,
without proper protection of her left extremity, and dehydrated.  It is my opinion the quality of care at
Highland Park did not meet the standard of good nursing home care, and robbed
Ms. Davis of quality of life, and hastened the loss of her legs.  

These comments and conclusions are true and correct to
the best of my knowledge.

 








In the trial court, Davis argued that,
with regard to the standard of care, Steinbauer stated it was below the
standard of care not to follow doctor=s orders.  As set forth above, Steinbauer observed three
aspects of Audrey Davis=s care in which the nursing home did not
follow Dr. Skelton=s orders: (1) the schedule of Audrey Davis=s feedings, (2)
the failure to obtain routinely ordered weights, and (3) lack of evidence that
every shift checked Audrey Davis=s G-tube.  Nowhere in his report, however, does
Steinbauer equate following the specific orders given in the present case with
what an ordinarily prudent hospital would do under the same or similar
circumstances.  See Palacios, 47
S.W.3d at 880.  AA trial court does
not abuse its discretion in dismissing a suit in which one is required to infer
the standard of care from the allegations in the expert report.@  Russ v. Titus Hosp. Dist., 128 S.W.3d
332, 343 (Tex. App.CTexarkana 2004, pet. denied) (citing Wright,
79 S.W.3d at 53); see also Strom v. Mem=l Hermann Hosp.
Sys.,
110 S.W.3d 216, 224 (Tex. App.CHouston [1st
Dist.] 2003, pet. denied) (concluding a report that arguably addressed breach
of the standard of care did not address the standard of care itself).

Nevertheless, even if we assume Steinbauer=s report, by implication,
sufficiently set forth the standard of care, the report fails to adequately
address the element of causation under Wright.  With regard to Audrey Davis=s feeding
schedule, Steinbauer opined:  AThis [change in Audrey Davis=s positioning as a result of the
change in feeding schedule] would increase her risk of pressure sores.  Indeed, she developed ulcers on her left leg,
and a sacral ulcer in May 2002.@  With regard to the failure to obtain
routinely ordered weights, Steinbauer opined: 
AThus, the patient struggled with
malnutrition during a time when careful attention should be paid to her
nutrition status in order to give her the best chance for ulcer healing.@ 
Finally, Steinbauer opined: AIt is my opinion the quality of care
at Highland Park did not meet the standard of good nursing home care, and
robbed Ms. Davis of quality of life, and hastened the loss of her legs.@








In Wright,
the plaintiffs complained that the hospital=s personnel had
failed to diagnose the patient=s foot fracture,
protect the patient=s foot, review diagnostic tests ordered
and administered at the hospital, or properly supervise a physician=s assistant who
x-rayed and diagnosed the patient.  Wright,
79 S.W.3d at 50.  Regarding causation,
the plaintiffs= expert stated, AI do believe that
it is reasonable to believe that if the x‑rays would have been correctly
read and the appropriate medical personnel acted upon those findings then
Wright would have had the possibility of a better outcome.@  Id. at 51.  The supreme court concluded:

After reviewing this report, we conclude that the trial
court could have reasonably determined that the report does not represent a
good‑faith effort to summarize the causal relationship between Bowie=s [the hospital=s] failure to meet the applicable
standards of care and Barbara=s injury.  That is
because the report simply opines that Barbara might have had Athe possibility of a better outcome@ without explaining how Bowie=s conduct caused injury to
Barbara.  We cannot infer from this
statement, as the Wrights ask us to, that Bowie=s alleged breach precluded Barbara
from obtaining a quicker diagnosis and treatment for her foot.  Rather, the report must include the required
information within its four corners. 
Because the report lacks information linking the expert=s conclusion (that Barbara might
have had a better outcome) to Bowie=s alleged breach (that it did not correctly read and act
upon the x‑rays), the trial court could have reasonably determined that
the report was conclusory.  A conclusory
report does not meet the Act=s requirements, because it does not satisfy the Palacios
test.

 

Id. at 53 (citations
omitted).

Like the expert=s opinion in Wright,
Steinbauer=s opinion that the quality of care at the
nursing home Arobbed Ms. Davis of quality of life, and
hastened the loss of her legs@ is
conclusory.  Steinbauer provides no basis
for his statement that Audrey Davis Astruggled with
malnutrition,@ and does not explain how lack of routine
weighing would contribute to malnutrition. 
Steinbauer did opine that the changes in Audrey Davis=s feeding schedule
and positioning Awould increase her risk of pressure sores,@ but provided no
link between the pressure sores and the loss of Audrey Davis=s legs.

As in Wright,
we hold the trial court did not abuse its discretion when it concluded
Steinbauer=s report relating to the nursing home did
not represent a good faith effort to meet the requirements of the MLIIA.  See id. at 54.

In sum, the trial
court did not abuse its discretion in dismissing either case based on the
inadequacy of the expert reports.  We
overrule Davis=s first issue in both cases.








B.      Denial of the Request for a Thirty-Day
Grace Period

In issue two,
Davis contends the trial court Acommitted
reversible error@ in denying his requests for thirty-day
extensions under former MLIIA section 13.01(g). 
An appellate court reviews a trial court=s decision to
grant or deny a section 13.01(g) grace period under an abuse-of-discretion
standard.  Walker v. Gutierrez,
111 S.W.3d 56, 62 (Tex. 2003).

Section 13.01(g)
provided:

Notwithstanding any other provision of this section, if a
claimant has failed to comply with a deadline established by Subsection (d) of
this section and after hearing the court finds that the failure of the claimant
or the claimant=s attorney was not intentional or
the result of conscious indifference but was the result of an accident or
mistake, the court shall grant a grace period of 30 days to permit the claimant
to comply with that subsection.  A motion
by a claimant for relief under this subsection shall be considered timely if it
is filed before any hearing on a motion by a defendant under Subsection (e) of
this section.

 

Act of May 5,
1995, 74th Leg., R.S., ch. 140,  ' 1, sec. 13.01(g),
1995 Tex. Gen. Laws 985, 986 (repealed 2003).

The section
13.01(g) grace period may be used to cure timely filed, but inadequate, expert
reports.  Walker, 111 S.W.3d at
62.  The standard for granting a grace
periodCi.e., Athat the failure
of the claimant or the claimant=s attorney was not
intentional or the result of conscious indifference but was the result of an
accident or mistake@Cmirrors the
standard for setting aside a default judgment or reinstating a case dismissed
for want of prosecution.  Id. at
63 (citing Tex. R. Civ. P.
165a(3) and Craddock v. Sunshine Bus Lines, Inc., 134 Tex. 388, 133
S.W.2d 124, 126 (1939)).








Although Asome mistakes of
law may negate a finding of intentional conduct or conscious indifference,
entitling the claimant to a grace period under section 13.01(g),@ not every act
that could be characterized as a mistake of law constitutes sufficient
excuse.  Id. at 64.  In Walker, for example, the supreme
court held that a claimant=s mistaken belief
his filed expert reports are adequate does not entitle the claimant to a
section 13.01(g) grace period.  Id.
at 64B65.

Intermediate
courts of appeals have upheld denials of requests for a 13.01(g) grace period
when the reasons for the request included, among others, difficulties with
discovery or obtaining records.  In Whitworth
v. Presbyterian Healthcare Center of North Texas, for example, the court of
appeals upheld denial of a grace period when the plaintiff presented two
reasons for filing an inadequate report: (1) his attorney=s belief the
report was adequate and (2) the impossibility of filing an adequate report
when  the defendant hospital had not
produced all the medical records.  No.
05-97-01684-CV, 2001 WL 1264238 at *1, *3 (Tex. App.CDallas Oct. 23,
2001, no pet.) (not designated for publication).  In Broom v. MacMaster, the court
upheld the trial court=s denial of a section 13.01(g) grace
period when the reasons given for the request included the lateness with which
the case was referred to counsel, the large amount of work created by the case
and other cases counsel was handling, and counsel=s assumption
opposing counsel would not seek strict compliance with the statutory
requirements.  992 S.W.3d 659, 664 (Tex.
App.CDallas 1999, no
pet.).

In the present
case, Davis based his request for both extensions on the difficulty he had
obtaining records from the hospital and the nursing home.  Specifically, he pointed to delay in
obtaining color photographs of Audrey Davis=s ulcers.  In response to the hospital=s motion Davis
alleged, AThe color photographs are extremely
important because there is a great discrepancy between the records of
Defendant, Spring Branch Medical Center, and the nursing home regarding the
development of the pressure ulcers and Audrey Davis= [sic] condition
when she arrived at the nursing home.@  He responded to the nursing home=s motion in
substantially the same terms.








In an affidavit in
support of the response to the hospital, Davis=s counsel stated, APhotographs of
Mrs. Davis were necessary for the experts to address the issue of development
and progression of the bedsores.@  He did not provide a similar affidavit in
response to the nursing home=s motion.

The evidence at
the hearing on the hospital=s motion
established that, with the exception of the color photographs, Davis=s counsel received
complete hospital records on October 10, 2003, and received the color
photographs on November 21, 2003.[11]  The three color photographs from the hospital
showed (1) Davis=s left or right heel on November 15, 2001,
(2) her right heel on November 19, 2001, and (3) her right heel on November 29,
the date of her discharge from the hospital and return to the nursing home.

The documents on
file and the evidence at the hearing on the nursing home=s motion
established that the trial court, in response to Davis=s motion to
compel, ordered that the nursing home produce all nursing and medical charts on
November 20, 2003, and all other records and documents responsive to Davis=s first request
for production on December 3, 2003. 
Davis therefore had access to the color photographs by December 3, 2003,
but Davis=s copying service did not make color
copies at that time, and, on January 12, 2004, counsel=s office again
requested access to the documents.  After
a second request and an additional motion to compel, the nursing home, in
mid-February 2004, provided color photographs of Audrey Davis=s right and left
heels taken November 29, 2001.

As stated above,
we apply an abuse-of-discretion standard to a trial court=s section 13.01(g)
grace period decision.  Walker,
111 S.W.3d at 62.  For three reasons, we
conclude the trial court did not abuse its discretion in denying Davis=s requests for
grace periods in both cases.








First, Davis=s actions were
arguably inconsistent with his asserted need for the photographs.  Davis did not request a section 13.01(g)
grace period in either case until after the respective health
care provider filed a motion to dismiss based on the inadequacy of the
reports.  Even then, Davis requested a
grace period only as an alternative to his argument that the filed reports were
adequate.[12]  Thus, Davis was arguing the color photographs
were essential to the experts= reports while at
the same time arguing the reports, made without access to the color
photographs, satisfied the statutory standards. 
The Dallas Court of Appeals characterized a similar argument as Aself-contradicting.@  Whitworth, 2001 WL 1264238 at *4. 

Second, by late
November or early December 2003, Davis had virtually all the information he contends
he needed.  By November 21, 2003, Davis
had complete records, including color photographs, from the hospital.  The third hospital photograph showed the
condition of Audrey Davis=s right heel on the date of her November
29, 2001 discharge from the hospital, essentially duplicating the information
in one of the two nursing home photographs. 
The only additional information provided by the color photographs from
the nursing home was the condition of Audrey Davis=s left heel on
November 29, 2001.  By December 3, 2003,
Davis had access to, and a black and white copy of, that photograph.








Despite having
received this information, Davis apparently did not file a motion for a
thirty-day extension under section 13.01(f). 
Such an extension would have required only a showing of good cause and,
if granted, would have extended the November 25, 2003 deadline to December 27,
2003.[13]  At least one court of appeals upholding a
trial court=s decision to deny a section 13.01(g)
grace period has considered counsel=s failure to seek
a Agood cause@ or agreed
extension of the 180-day deadline.  See
Broom, 992 S.W.2d at 664.

Finally, Davis
presented the trial court with no evidence of how the two experts might have
cured the deficiencies in their reports had they been able to view the color
photographs.  In his report, Gibson
states only that photographs were not available to him, and Steinbauer makes no
mention at all of photographs.  Neither
doctor stated how the absence of color photographs hindered him in forming an
opinion about the standard of care, about failure to meet the standard, or
about causation in relation to either the hospital or the nursing home.

In her affidavit
in support of the request for a grace period in the case against the hospital,
Davis=s counsel stated
only that photographs were Anecessary for the
experts to address the issue of development and progression of the bedsores.@  Like the expert reports, this statement
provides no information about how viewing the color photographs might have
resulted in more adequate reports, particularly when Gibson knew without the
photographs that there was no evidence of a decubitus ulcer when Audrey Davis
entered the hospital, and that she had stage four and stage one ulcers, on her
right and left heels, respectively, when she was discharged November 29,
2001.  Without evidence of what the
experts might do differently if given more time, the trial court cannot be said
to have abused its discretion in denying a thirty-day grace period.

Given the timing
and nature of Davis=s requests and the evidence before the
trial court, the trial court did not abuse its discretion in denying the
requests for a section 13.01(g) grace period in both cases.  We overrule Davis=s issue two.

 








C.      Denial of the Request to File Findings of
Fact and Conclusions of Law

In issue three,
Davis contends the trial court Acommitted
reversible error by declining to prepare and file findings of fact and
conclusions of law.@  In
both cases, Davis requested findings of fact and conclusions of law Aregarding [the
trial court=s] Order granting sanctions@ and Aregarding its
Order granting dismissal.@

Dismissal under
section 13.01 is a sanction.  Palacios,
46 S.W.3d at 877; Mocega v. Urquhart, 79 S.W.3d 61, 64 (Tex. App.CHouston [14th
Dist.] 2002, pet. denied).   When a trial
court renders judgment as a sanction, findings of facts and conclusions of law
are not required because (1) findings of fact and conclusions of law are often
unnecessary, (2) requiring them in every case would unduly burden trial courts,
and (3) appellate courts are not obliged to give them the same level of
deference.  Smalling v. Gardner,
No. 14-03-01079-CV, 2005 WL 549855 at *12 (Tex. App.CHouston [14th
Dist.] Mar. 10, 2005, no pet. h.) (citing IKB Indus. (Nigeria) Ltd. v. Pro‑Line
Corp., 938 S.W.2d 440, 442 (Tex. 1997)). 
Thus, Awhen a trial court dismisses a claim
because the plaintiff failed to comply with the MLIIA=s procedural
requirements, it is appropriate to file findings of fact and conclusions
of law, but the trial court is not required to do so.@  Id.








Furthermore, as
discussed in sections II-A. and II-B. above, the decisions to dismiss on the
ground of an inadequate expert report and the decision to grant or deny a grace
period are reviewed for an abuse of discretion. 
See Walker, 111 S.W.3d at 62 (regarding grace period);  Wright, 79 S.W.3d at 52 (regarding expert report); Palacios,
46 S.W.3d at 878 (same).  Unless a
statute or rule specifically states otherwise, when an abuse-of-discretion
standard applies on appeal, findings of fact and conclusions of law are not
required.  See Winters v. Chubb &
Son, Inc., 132 S.W.3d 568, 580 (Tex. App.CHouston [14th
Dist.] 2004, no pet.) (in context of review of an award of attorney=s fees, stating Afindings of fact
are not required in an abuse of discretion review@); Samuelson v.
United Healthcare of Tex., Inc., 79 S.W.3d 706, 710 (Tex. App.CFort Worth 2002,
no pet.) (holding when abuse-of-discretion standard of review applies to trial
court=s ruling, findings
of fact and conclusions of law, although helpful, are not required).

For the preceding
reasons, we conclude the trial court was not required to file findings of fact
and conclusions of law and, therefore, did not abuse its discretion in
declining to do so.  See Smalling,
2005 WL 549855 at *12.

III.  Conclusion

Having overruled
Davis=s three issues in
both cases, we affirm the judgments of the trial court dismissing Davis=s claims against
the hospital and the nursing home.

 

 

 

 

 

/s/      Eva
M. Guzman

Justice

 

Judgment rendered
and Opinion filed July 14, 2005.

Panel consists of
Justices Edelman, Seymore, and Guzman.

 

 

 











[1]  See Act
of May 30, 1977, 65th Leg., R.S., ch. 817, ''
1.01B12.01, 1977 Tex. Gen. Laws 2039, 2039B2053 (former Tex. Rev. Civ. Stat. art. 4590i), repealed
by Act of June 2, 2003, 78th Leg., ch. 204, ' 10.09,
2003 Tex. Gen. Laws 847, 884.





[2]  We refer to
the appellant as ADavis,@ and to his mother as AAudrey
Davis.@





[3]  In addition to
the hospital and nursing home, Davis sued various other individuals.  They were subsequently non-suited.





[4]  In his
statement of the facts in his petition, Davis set forth allegations sounding in
fraud and breach of contract.  He does
not argue that any of his claims were other than health care liability claims
covered by the MLIIA.





[5]  See Act of May 5, 1995, 74th Leg.,
R.S., ch. 140,  ' 1, sec. 13.01 (d), 1995 Tex. Gen.
Laws 985, 986, repealed by Act of June 2, 2003, 78th Leg., R.S. ch. 204,
' 10.09, 2003 Tex. Gen. Laws 847,
884.





[6]  In a
subsequent hearing, the court admitted, for purposes of comparison, the black
and white photographs Davis had received as part of the medical records.





[7]  Davis also
filed a motion to sever his case against the hospital.  The docket sheet indicates the trial court
granted the motion on March 15, 2004, but there is no written severance order
in the appellate record.  Nevertheless,
as discussed below, the trial court dismissed the remaining claimsCi.e., those
against the nursing homeCon July 29, 2004. 
We therefore treat the March 17, 2004 notice of appeal as a prematurely
filed notice.  See Tex. R. App. P. 27.1(a).





[8]  The nursing
home=s motion is not a part of the record on appeal.





[9]  In a letter
dated January 12, 2004, an agent of plaintiff=s
counsel wrote the nursing home: AEvidently,
when the nursing home records regarding Audrey Davis were copied previously,
our copy service failed to make color copies of the photographs.  We would like to send the service back to
correct the error.  Please advise when
that will be possible.@





[10]  In his
response to the nursing home=s motion, Davis specifically stated he was relying on
Steinbauer=s report and cited the trial court only to that report
but attached both reports to his response. 
In this court, Davis argues the trial court should have considered both
reports in his case against the nursing home. 
In the trial court, Davis made that argument only in the context of his
case against the hospital.  Davis has not
preserved the argument that the trial court should have considered both reports
in relation to the nursing home.  See
Tex. R. App. P. 33.1(a) (stating,
as prerequisite to presenting complaint for appellate review, party must make
complaint to trial court).  Even were we
to consider Gibson=s report along with Steinbauer=s in relation to the nursing home, the reports do not
meet the statutory standards.  Gibson
states only that he Awould have concerns about the standard of care@ and disagrees with another expert=s statement that the nursing home A>allowed the stage four ulcer to develop gangrene.=@





[11]  In the trial
court, Davis complained of his late receipt of the hospital records covering
the time period between November 12 and November 29, 2001, when Audrey Davis
developed a stage four ulcer on her right heel and a stage one ulcer on her
left heel.  In her letter of March 13,
2003, to the hospital, Davis=s counsel requested Audrey Davis=s Acomplete medical and billing records, including
photographs . . . from January 1, 2002 to the present.@  According to
the documentary evidence, counsel=s
earliest request to the hospital for the November 2001 records was made
September 17, 2003.





[12]  To the extent
Davis was operating on the mistaken belief the reports were adequate, that
belief is insufficient to support a section 13.01(g) grace period.  See Walker v. Gutierrez, 111 S.W.3d
56, 64B65 (Tex. 2003).





[13]  Section 13.01(f)
provided:  AThe
court may, for good cause shown after motion and hearing, extend any time
period specified in Subsection (d) of this section for an additional 30
days.  Only one extension may be granted
under this subsection.@  Act of May 5,
1995, 74th Leg., R.S., ch. 140,  ' 1, sec 13.01(f), 1995 Tex. Gen. Laws 985, 986
(repealed 2003).  Because the thirtieth
day fell on December 25, 2003, and December 25 and 26 are legal holidays, the
thirty days would have expired December 27. 
See Tex. Gov=t Code Ann. '' 662.003(a)(9), (b)(8), 662.021 (Vernon 2004); Tex. R. Civ. P. 4.  A motion under section 13.01(f) would have
been timely until December 27, 2003.  See
Pfeiffer v. Jacobs, 29 S.W.3d 193, 197 (Tex. App.CHouston [14th Dist.] 2000, pet. denied).