Ceasar **DAVIS**, Jr., as Attorney–in–Fact for his Mother, Audrey Davis, **Appellant**

v.

**SPRING BRANCH MEDICAL CENTER, INC., Appellee.**

Ceasar **Davis**, Jr., as Attorney–in–Fact for his Mother, Audrey Davis, **Appellant**

v.

**Modern Health Systems, Inc. d/b/a/ Highland Park Care Center, Appellee.**

Nos. 14–04–00258–CV, 14–04–00927–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 14, 2005.

Marian S. Rosen, Houston, TX, for appellant.

John Wesley Raley, Kirsten Anne Davenport, Houston, Gary L. McConnell, Horseshoe Bay, Lanette L. Matthews, and Diana L. Faust, Dallas, TX, for appellees.

Panel consists of Justices EDELMAN, SEYMORE, and GUZMAN.

**1.** *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§ 1.01-12.01, 1977 Tex. Gen. Laws 2039, 2039-2053 (former Tex.Rev.Civ. Stat. art. 4590i), *repealed by* Act of June 2, 2003, 78th Leg., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

**2.** We refer to the appellant as "Davis," and to his mother as "Audrey Davis."

## OPINION

EVA M. GUZMAN, Justice.

In this case, brought under the former Medical Liability and Insurance Improvement Act ("MLIIA"),[1] appellant, Ceasar Davis, Jr., as attorney-in-fact for his mother, Audrey Davis, sued appellees Spring Branch Medical Center, Inc. ("the hospital"), and Modern Health Systems, Inc. ("the nursing home").[2] On appeal, Davis challenges the trial court's orders (1) granting appellees' motions to dismiss Davis's claims with prejudice because he failed to file adequate expert reports as required by the MLIIA, (2) denying his requests for a thirty-day grace period in which to file conforming expert reports, and (3) declining to enter findings of fact and conclusions of law. We affirm.

## I. PROCEDURAL BACKGROUND

On May 29, 2003, Davis sued the hospital and the nursing home based on their treatment of his mother, Audrey Davis, from primarily mid-November 2001 through late April 2002.[3] During that time, Audrey Davis developed pressure ulcers on both feet and ultimately had to have both legs amputated above the knees. In the lawsuit, Davis asserted claims of negligence, gross negligence, and malice against the hospital; and claims of negligence, negligence per se (violation of regulations and statutes and injury to an elderly person), negligent hiring, gross negligence, and malice against the nursing home.[4]

**3.** In addition to the hospital and nursing home, Davis sued various other individuals. They were subsequently non-suited.

**4.** In his statement of the facts in his petition, Davis set forth allegations sounding in fraud and breach of contract. He does not argue that any of his claims were other than health care liability claims covered by the MLIIA.

Under the MLIIA, Davis's 180–day period for furnishing expert reports to the hospital and the nursing home expired November 25, 2003.[5] On August 25, 2003, Davis filed and served the expert report and curriculum vitae of Dr. Donald M. Gibson. On September 8, 2003, he filed and served the expert report and curriculum vitae of Dr. J.R. Steinbauer.

On January 27, 2004, the hospital filed a motion to dismiss Davis's claims with prejudice on the ground the expert reports were inadequate. Davis responded, arguing both Gibson's and Steinbauer's reports met the statutory requirements. In the alternative, he requested a thirty-day grace period within which to file additional reports if the court determined the reports on file were inadequate. As grounds for the extension, Davis alleged he had experienced difficulty obtaining "medical records and complete nursing home records," including color photographs of Audrey Davis's ulcers.

The trial court heard the hospital's motion and Davis's request on February 19, 2004. Counsel for Davis and for the hospital testified regarding when various documents were provided. Davis's counsel stated that, with the exception of the color photographs, she received complete hospital records on October 10, 2003. The hospital's counsel testified, without objection, he had been informed by his office that Davis's counsel received black and white photographs, which were part of the medical chart, in April 2003, and would certainly have had these photographs by October 19, 2003. Further, it was his understanding that Davis's counsel received the color photographs from the hospital on November 21, 2003.

In addition to this testimony, the court admitted into evidence the two reports, the color photographs, documents reflecting Davis's requests for records, and the hospital's responses.[6] The documents included the hospital's November 20, 2003 discovery response, to which color photographs were attached, and a certified mail receipt indicating receipt by Davis's counsel's office on November 21, 2003.

By written order entered February 20, 2004, the trial court granted the hospital's motion to dismiss and denied Davis's request for a thirty-day grace period. The order reads in part:

> The court finds that the failure of plaintiff to file an adequate report was not the result of accident or mistake. Accordingly, the court hereby denies the plaintiff's motion for grace period. Similarly, the court hereby grants the defendant's motion to dismiss for failure to provide an expert report that satisfies the statutory requirements.

Davis then requested the trial court enter findings of fact and conclusions of law. By written order entered March 15, 2004, the court declined to do so, stating it was not required to do so under the MLIIA, the Texas Rules of Civil Procedure, or any applicable case law. On March 17, 2004, Davis filed a notice of appeal from the February 20, 2004 order.[7]

---

**5.** *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(d), 1995 Tex. Gen. Laws 985, 986, *repealed by* Act of June 2, 2003, 78th Leg., R.S. ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

**6.** In a subsequent hearing, the court admitted, for purposes of comparison, the black and white photographs Davis had received as part of the medical records.

**7.** Davis also filed a motion to sever his case against the hospital. The docket sheet indicates the trial court granted the motion on March 15, 2004, but there is no written severance order in the appellate record. Nevertheless, as discussed below, the trial court dismissed the remaining claims—*i.e.*, those against the nursing home—on July 29, 2004. We therefore treat the March 17, 2004 notice

The nursing home also filed a motion to dismiss on the ground the expert reports were inadequate.[8] Davis responded to the nursing home's motion, relying only on Steinbauer's report. Davis again requested, in the alternative, a thirty-day grace period within which to file additional reports if the court were to find Steinbauer's report inadequate. As before, he alleged he had experienced difficulty obtaining complete medical and nursing home records, including color photographs of Audrey Davis's ulcers. He specifically alleged he did not receive the color photographs from the nursing home until February 12, 2004, after he had to invoke the court's power to compel.

The trial court heard the nursing home's motion and Davis's request on July 1, 2004. The trial court admitted the expert reports, the color photographs, the corresponding black and white copies, and documents reflecting correspondence between Davis and the hospital and nursing home. In addition, the trial court heard testimony from Davis's counsel.

Davis's counsel testified she began requesting records from the nursing home in May 2002. When the nursing home had not provided records by July 2002, counsel reported the nursing home to the Texas Department of Human Services (TDHS), and TDHS conducted an investigation in September 2002. By September 9, 2002, counsel had received a 550–page document, for which the family paid a dollar per page. According to its investigation report, TDHS found the nursing home violated regulations providing for a patient's right to purchase photo copies at a rate not exceeding community standards.

Counsel testified further that, on March 11, 2003, she again wrote the nursing home. In that letter counsel stated, "No photographs were included with the records we received regarding Audrey Davis. Would you please forward copies of the photographs in Mrs. Davis' [sic] records, in color, as soon as possible." On November 21, 2003, the trial court ordered the nursing home to produce documents on December 3, 2003. Counsel testified they went to the nursing home that day, but the color photographs were not copied at that time. Counsel testified that, on February 10, 2004, she again requested color copies of the photographs.[9] According to counsel, she received color photographs from the nursing home on February 12, 2004, in response to a second motion to compel. On cross-examination, counsel admitted that "there was no extension of time to file any further expert reports in this case after the 180–day time period furnishing [sic] an adequate report expired until [she] filed the response to [the nursing home's] motion to dismiss."

By written order entered July 29, 2004, the trial court granted the nursing home's motion to dismiss and denied Davis's request for a thirty-day grace period. The order was substantively identical to that previously entered in Davis's case against the hospital. Davis again requested findings of fact and conclusions of law, and on September 17, 2004, filed a notice of appeal in his case against the nursing home.

of appeal as a prematurely filed notice. *See* Tex.R.App. P. 27.1(a).

8. The nursing home's motion is not a part of the record on appeal.

9. In a letter dated January 12, 2004, an agent of plaintiff's counsel wrote the nursing home:

"Evidently, when the nursing home records regarding Audrey Davis were copied previously, our copy service failed to make color copies of the photographs. We would like to send the service back to correct the error. Please advise when that will be possible."

This court subsequently granted Davis's motion to consolidate the two cases for purposes of appeal. In both cases, Davis contends the trial court "committed reversible error" by (1) granting the appellees' motions to dismiss because the expert reports were insufficient to meet the requirements of the MLIIA, (2) denying Davis's requests for a thirty-day grace period in which to file sufficient reports, and (3) declining to prepare and file findings of fact and conclusions of law.

## II. DISCUSSION

### A. The Insufficiency of the Expert Reports

In issue one, Davis contends the trial court "erred" in dismissing his lawsuits on the ground that his expert reports did not meet the requisite standards of the MLIIA. Under former MLIIA section 10.01(d), not later than the 180th day after filing suit or the last day of any extended period under subsection (f) or (h), a health care liability claimant who wished to pursue a claim was required to furnish an expert report for each physician or health care provider against whom he asserted a claim. Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(d), 1995 Tex. Gen. Laws 985, 986, *repealed by* Act of June 2, 2003, 78th Leg., R.S. ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Subsection (e) provided that, if the claimant failed to comply with subsection (d) within the time allowed, the court should, on the defendant's motion, enter an order dismissing the claim with prejudice as a sanction against the claimant. *Id.* sec. 13.01(e), 1995 Tex. Gen. Laws at 986. Under subsection (*l*), a defendant could challenge the adequacy of a timely filed report, and the trial court was to grant the motion only if it appeared to the court, after a hearing, that the report did not represent a good faith effort to comply with the definition of an expert report set out in subsection section (r)(6). *Id.* sec. 13.01(*l*), 1995 Tex. Gen. Laws at 987.

■ We apply an abuse-of-discretion standard in reviewing a trial court's decision to dismiss a claim under subsections (d), (e) and (*l*) on the ground of an inadequate report. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875, 878 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Wright*, 79 S.W.3d at 52 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for the trial court's judgment. *Id.* (citing *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex.1989)).

■ The MLIIA defined an "expert report" as

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(r)(6), 1995 Tex. Gen. Laws 985, 987 (repealed 2003). Accordingly, the expert report has to set out, in nonconclusory language, the expert's opinions about three elements of the claim: the standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 879.

■ Although the report need not marshal all the plaintiff's proof, it must

fulfill two purposes in order to constitute a good faith effort under subsection (*l*). *Id.* at 878-89. First, it must inform the defendant of the specific conduct the plaintiff calls into question; and second, it must provide the trial court with a basis to conclude the plaintiff's claims have merit. *Id.* A report merely stating the expert's conclusions, or one omitting any of the statutory requirements, does not constitute a good faith effort. *Id.* at 879. Finally, the report itself must include the required information within its four corners. *Wright,* 79 S.W.3d at 53; *Palacios,* 46 S.W.3d at 878.

 *The hospital.* In responding to the hospital's motion, Davis relied on both Steinbauer's and Gibson's reports. The only comment Steinbauer makes regarding the hospital is the following: "When the patient was in Spring Branch Medical Center, her tube feedings were done by intermittent bolus."

Gibson sets forth the chronology of Audrey Davis's stays at the hospital and nursing home from October 1, 2001, through April 29, 2002. He indicates that, during her first stay at the hospital, "she had gone from having no decubitus ulcer to a stage four decubitus ulcer to the right heel that was 6 cm. by 5 cm. and also had a stage one ulcer to the left heel." His only statement regarding the standard of care is the following:

From my reading of this case, I would have concerns about the standard of care that the patient received at both the nursing home and Spring Branch Hospital. In my opinion the possibility exists that they both fell below the standard of care a patient should have received in a situation such as Ms. Davis' [sic].

 The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880. A fair summary of the standard of care must set out what care was expected, but not given. *Id.* In *Palacios,* the supreme court held that a statement that precautions were not taken to prevent a patient's fall was not a statement of the standard of care. *Id.* Gibson's statement regarding the standard of care in the present case is even less informative than that provided by the expert in *Palacios.*

As in *Palacios,* we hold the trial court did not abuse its discretion when it concluded the expert reports relating to the hospital did not represent a good faith effort to meet the requirements of the MLIIA. *See id.* at 875.

 *The nursing home.* In responding to the nursing home's motion, Davis relied only on Steinbauer's report.[10] Other than a list of Steinbauer's qualifications and the documents he reviewed, Stein-

___

10. In his response to the nursing home's motion, Davis specifically stated he was relying on Steinbauer's report and cited the trial court only to that report but attached both reports to his response. In this court, Davis argues the trial court should have considered both reports in his case against the nursing home. In the trial court, Davis made that argument only in the context of his case against the hospital. Davis has not preserved the argument that the trial court should have considered both reports in relation to the nursing home. *See* Tex.R.App. P. 33.1(a) (stating, as prerequisite to presenting complaint for appellate review, party must make complaint to trial court). Even were we to consider Gibson's report along with Steinbauer's in relation to the nursing home, the reports do not meet the statutory standards. Gibson states only that he "would have concerns about the standard of care" and disagrees with another expert's statement that the nursing home "allowed the stage four ulcer to develop gangrene."

bauer's report, in its entirety consists of the following:

I understand that Ms. Davis' [sic] family has concerns about the quality of care she received at Highland Park. Specifically, when they visited her in April of 2002 and found her in pain, without protection properly applied to her heel ulcer, and apparently not getting enough fluid. Within a few days of this visit, the patient did undergo amputation of the ulcerous left leg. This unfortunate even [sic] occurred a few months after her right leg had been amputated.

Ms. Davis had severe vascular disease and also had diabetes. Her diseases certainly have a poor prognosis by virtue of their chronicity and irreversibility. The question becomes, did the Highland Park Nursing Center provide care that was standard and, if not, did substandard care rob Ms. Davis of quality and quantity of life which she would otherwise have?

Careful review of the nursing home records and hospital records raises the following concerns:

● When the patient was in Spring Branch Medical Center, her tube feedings were done by intermittent bolus. Despite an order from Dr. Skelton on 2–7–02 for the patient to receive her tube feeding every 4 hours by bolus, nurses notes from Highland Park on 2–8–02 show the patient was receiving a 2 hour infusion of her tube feeding. The problem here is that Ms. Davis spent long periods of time with the head of the bed (HOB) elevated and remaining in bed. This change, while making nursing care for the tube feeding easier, makes proper positioning of the patient difficult. This would increase her risk of pressure sores. Indeed, she developed ulcers on her left leg, and a sacral ulcer in May 2002.

● Dietary notes repeatedly mention the failure of Highland Park staff to obtain routinely ordered weights. Thus, the patient struggled with malnutrition during a time when careful attention should be paid to her nutrition status in order to give her the best chance for ulcer healing. Dr. Skelton ordered weekly weights in March of 2002, and this order was also not carried out.

● Dr. Skelton ordered that the G-tube be checked for position, gastric residuals checked, and the tube be flushed every shift. Flow sheet data show this was signed off at the end of a month as "okay", but evidence of performance every shift was lacking.

Each of these variances between what the doctor ordered, and was [sic] actually done at Highland Park, call to question the quality of all care provided by Highland Park. The errors in care I found in the record would support the observations of the family in April 2002 when they allege they found patient in pain, without proper protection of her left extremity, and dehydrated. It is my opinion the quality of care at Highland Park did not meet the standard of good nursing home care, and robbed Ms. Davis of quality of life, and hastened the loss of her legs.

These comments and conclusions are true and correct to the best of my knowledge.

 In the trial court, Davis argued that, with regard to the standard of care, Steinbauer stated it was below the standard of care not to follow doctor's orders. As set forth above, Steinbauer observed three aspects of Audrey Davis's care in which the nursing home did not follow Dr. Skelton's orders: (1) the schedule of Au-

drey Davis's feedings, (2) the failure to obtain routinely ordered weights, and (3) lack of evidence that every shift checked Audrey Davis's G-tube. Nowhere in his report, however, does Steinbauer equate following the specific orders given in the present case with what an ordinarily prudent hospital would do under the same or similar circumstances. *See Palacios,* 46 S.W.3d at 880. "A trial court does not abuse its discretion in dismissing a suit in which one is required to infer the standard of care from the allegations in the expert report." *Russ v. Titus Hosp. Dist.,* 128 S.W.3d 332, 343 (Tex.App.—Texarkana 2004, pet. denied) (citing *Wright,* 79 S.W.3d at 53); *see also Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 224 (Tex.App.—Houston [1st Dist.] 2003, pet. denied) (concluding a report that arguably addressed breach of the standard of care did not address the standard of care itself).

Nevertheless, even if we assume Steinbauer's report, by implication, sufficiently set forth the standard of care, the report fails to adequately address the element of causation under *Wright.* With regard to Audrey Davis's feeding schedule, Steinbauer opined: "This [change in Audrey Davis's positioning as a result of the change in feeding schedule] would increase her risk of pressure sores. Indeed, she developed ulcers on her left leg, and a sacral ulcer in May 2002." With regard to the failure to obtain routinely ordered weights, Steinbauer opined: "Thus, the patient struggled with malnutrition during a time when careful attention should be paid to her nutrition status in order to give her the best chance for ulcer healing." Finally, Steinbauer opined: "It is my opinion the quality of care at Highland Park did not meet the standard of good nursing home care, and robbed Ms. Davis of quality of life, and hastened the loss of her legs."

In *Wright,* the plaintiffs complained that the hospital's personnel had failed to diagnose the patient's foot fracture, protect the patient's foot, review diagnostic tests ordered and administered at the hospital, or properly supervise a physician's assistant who x-rayed and diagnosed the patient. *Wright,* 79 S.W.3d at 50. Regarding causation, the plaintiffs' expert stated, "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome." *Id.* at 51. The supreme court concluded:

> After reviewing this report, we conclude that the trial court could have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship between Bowie's [the hospital's] failure to meet the applicable standards of care and Barbara's injury. That is because the report simply opines that Barbara might have had "the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara. We cannot infer from this statement, as the Wrights ask us to, that Bowie's alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot. Rather, the report must include the required information within its four corners. Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory. A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test.

*Id.* at 53 (citations omitted).

Like the expert's opinion in *Wright,* Steinbauer's opinion that the quality of care

at the nursing home "robbed Ms. Davis of quality of life, and hastened the loss of her legs" is conclusory. Steinbauer provides no basis for his statement that Audrey Davis "struggled with malnutrition," and does not explain how lack of routine weighing would contribute to malnutrition. Steinbauer did opine that the changes in Audrey Davis's feeding schedule and positioning "would increase her risk of pressure sores," but provided no link between the pressure sores and the loss of Audrey Davis's legs.

As in *Wright,* we hold the trial court did not abuse its discretion when it concluded Steinbauer's report relating to the nursing home did not represent a good faith effort to meet the requirements of the MLIIA. *See id.* at 54.

In sum, the trial court did not abuse its discretion in dismissing either case based on the inadequacy of the expert reports. We overrule Davis's first issue in both cases.

### B. Denial of the Request for a Thirty–Day Grace Period

 In issue two, Davis contends the trial court "committed reversible error" in denying his requests for thirty-day extensions under former MLIIA section 13.01(g). An appellate court reviews a trial court's decision to grant or deny a section 13.01(g) grace period under an abuse-of-discretion standard. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

Section 13.01(g) provided:

Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall

grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01(g), 1995 Tex. Gen. Laws 985, 986 (repealed 2003).

 The section 13.01(g) grace period may be used to cure timely filed, but inadequate, expert reports. *Walker,* 111 S.W.3d at 62. The standard for granting a grace period—*i.e.,* "that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake"—mirrors the standard for setting aside a default judgment or reinstating a case dismissed for want of prosecution. *Id.* at 63 (citing Tex.R. Civ. P. 165a(3) and *Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 133 S.W.2d 124, 126 (1939)).

 Although "some mistakes of law may negate a finding of intentional conduct or conscious indifference, entitling the claimant to a grace period under section 13.01(g)," not every act that could be characterized as a mistake of law constitutes sufficient excuse. *Id.* at 64. In *Walker,* for example, the supreme court held that a claimant's mistaken belief his filed expert reports are adequate does not entitle the claimant to a section 13.01(g) grace period. *Id.* at 64–65.

Intermediate courts of appeals have upheld denials of requests for a 13.01(g) grace period when the reasons for the request included, among others, difficulties with discovery or obtaining records. In *Whitworth v. Presbyterian Healthcare Center of North Texas,* for example, the court of appeals upheld denial of a grace

period when the plaintiff presented two reasons for filing an inadequate report: (1) his attorney's belief the report was adequate and (2) the impossibility of filing an adequate report when the defendant hospital had not produced all the medical records. No. 05–97–01684–CV, 2001 WL 1264238 at *1, *3 (Tex.App.—Dallas Oct. 23, 2001, no pet.) (not designated for publication). In *Broom v. MacMaster*, the court upheld the trial court's denial of a section 13.01(g) grace period when the reasons given for the request included the lateness with which the case was referred to counsel, the large amount of work created by the case and other cases counsel was handling, and counsel's assumption opposing counsel would not seek strict compliance with the statutory requirements. 992 S.W.2d 659, 664 (Tex.App.—Dallas 1999, no pet.).

█ In the present case, Davis based his request for both extensions on the difficulty he had obtaining records from the hospital and the nursing home. Specifically, he pointed to delay in obtaining color photographs of Audrey Davis's ulcers. In response to the hospital's motion Davis alleged, "The color photographs are extremely important because there is a great discrepancy between the records of Defendant, Spring Branch Medical Center, and the nursing home regarding the development of the pressure ulcers and Audrey Davis' [sic] condition when she arrived at the nursing home." He responded to the nursing home's motion in substantially the same terms.

In an affidavit in support of the response to the hospital, Davis's counsel stated, "Photographs of Mrs. Davis were necessary for the experts to address the issue of development and progression of the bedsores." He did not provide a similar affidavit in response to the nursing home's motion.

The evidence at the hearing on the hospital's motion established that, with the exception of the color photographs, Davis's counsel received complete hospital records on October 10, 2003, and received the color photographs on November 21, 2003.[11] The three color photographs from the hospital showed (1) Davis's left or right heel on November 15, 2001, (2) her right heel on November 19, 2001, and (3) her right heel on November 29, the date of her discharge from the hospital and return to the nursing home.

The documents on file and the evidence at the hearing on the nursing home's motion established that the trial court, in response to Davis's motion to compel, ordered that the nursing home produce all nursing and medical charts on November 20, 2003, and all other records and documents responsive to Davis's first request for production on December 3, 2003. Davis therefore had access to the color photographs by December 3, 2003, but Davis's copying service did not make color copies at that time, and, on January 12, 2004, counsel's office again requested access to the documents. After a second request and an additional motion to compel, the nursing home, in mid-February 2004, provided color photographs of Audrey Davis's right and left heels taken November 29, 2001.

---

11. In the trial court, Davis complained of his late receipt of the hospital records covering the time period between November 12 and November 29, 2001, when Audrey Davis developed a stage four ulcer on her right heel and a stage one ulcer on her left heel. In her letter of March 13, 2003, to the hospital, Davis's counsel requested Audrey Davis's "complete medical and billing records, including photographs ... from January 1, 2002 to the present." According to the documentary evidence, counsel's earliest request to the hospital for the November 2001 records was made September 17, 2003.

As stated above, we apply an abuse-of-discretion standard to a trial court's section 13.01(g) grace period decision. *Walker*, 111 S.W.3d at 62. For three reasons, we conclude the trial court did not abuse its discretion in denying Davis's requests for grace periods in both cases.

First, Davis's actions were arguably inconsistent with his asserted need for the photographs. Davis did not request a section 13.01(g) grace period in either case until *after* the respective health care provider filed a motion to dismiss based on the inadequacy of the reports. Even then, Davis requested a grace period only as an alternative to his argument that the filed reports were adequate.[12] Thus, Davis was arguing the color photographs were essential to the experts' reports while at the same time arguing the reports, made without access to the color photographs, satisfied the statutory standards. The Dallas Court of Appeals characterized a similar argument as "self-contradicting." *Whitworth*, 2001 WL 1264238 at *4.

Second, by late November or early December 2003, Davis had virtually all the information he contends he needed. By November 21, 2003, Davis had complete records, including color photographs, from the hospital. The third hospital photograph showed the condition of Audrey Davis's right heel on the date of her November 29, 2001 discharge from the hospi-

tal, essentially duplicating the information in one of the two nursing home photographs. The only additional information provided by the color photographs from the nursing home was the condition of Audrey Davis's left heel on November 29, 2001. By December 3, 2003, Davis had access to, and a black and white copy of, that photograph.

Despite having received this information, Davis apparently did not file a motion for a thirty-day extension under section 13.01(f). Such an extension would have required only a showing of good cause and, if granted, would have extended the November 25, 2003 deadline to December 27, 2003.[13] At least one court of appeals upholding a trial court's decision to deny a section 13.01(g) grace period has considered counsel's failure to seek a "good cause" or agreed extension of the 180–day deadline. *See Broom*, 992 S.W.2d at 664.

Finally, Davis presented the trial court with no evidence of how the two experts might have cured the deficiencies in their reports had they been able to view the color photographs. In his report, Gibson states only that photographs were not available to him, and Steinbauer makes no mention at all of photographs. Neither doctor stated how the absence of color photographs hindered him in forming an opinion about the standard of care, about failure to meet the standard, or about cau-

---

**12.** To the extent Davis was operating on the mistaken belief the reports were adequate, that belief is insufficient to support a section 13.01(g) grace period. *See Walker v. Gutierrez*, 111 S.W.3d 56, 64–65 (Tex.2003).

**13.** Section 13.01(f) provided: "The court may, for good cause shown after motion and hearing, extend any time period specified in Subsection (d) of this section for an additional 30 days. Only one extension may be granted under this subsection." Act of May 5, 1995,

74th Leg., R.S., ch. 140, § 1, sec 13.01(f), 1995 Tex. Gen. Laws 985, 986 (repealed 2003). Because the thirtieth day fell on December 25, 2003, and December 25 and 26 are legal holidays, the thirty days would have expired December 27. *See* Tex. Gov't Code Ann. §§ 662.003(a)(9), (b)(8), 662.021 (Vernon 2004); Tex.R. Civ. P. 4. A motion under section 13.01(f) would have been timely until December 27, 2003. *See Pfeiffer v. Jacobs*, 29 S.W.3d 193, 197 (Tex.App.—Houston [14th Dist.] 2000, pet. denied).

sation in relation to either the hospital or the nursing home.

In her affidavit in support of the request for a grace period in the case against the hospital, Davis's counsel stated only that photographs were "necessary for the experts to address the issue of development and progression of the bedsores." Like the expert reports, this statement provides no information about how viewing the color photographs might have resulted in more adequate reports, particularly when Gibson knew without the photographs that there was no evidence of a decubitus ulcer when Audrey Davis entered the hospital, and that she had stage four and stage one ulcers, on her right and left heels, respectively, when she was discharged November 29, 2001. Without evidence of what the experts might do differently if given more time, the trial court cannot be said to have abused its discretion in denying a thirty-day grace period.

Given the timing and nature of Davis's requests and the evidence before the trial court, the trial court did not abuse its discretion in denying the requests for a section 13.01(g) grace period in both cases. We overrule Davis's issue two.

### C. Denial of the Request to File Findings of Fact and Conclusions of Law

In issue three, Davis contends the trial court "committed reversible error by declining to prepare and file findings of fact and conclusions of law." In both cases, Davis requested findings of fact and conclusions of law "regarding [the trial court's] Order granting sanctions" and "regarding its Order granting dismissal."

Dismissal under section 13.01 is a sanction. *Palacios*, 46 S.W.3d at 877; *Mocega v. Urquhart*, 79 S.W.3d 61, 64 (Tex.App.—Houston [14th Dist.] 2002, pet. denied). When a trial court renders judgment as a sanction, findings of facts and

conclusions of law are not required because (1) findings of fact and conclusions of law are often unnecessary, (2) requiring them in every case would unduly burden trial courts, and (3) appellate courts are not obliged to give them the same level of deference. *Smalling v. Gardner,* —— S.W.3d ——, ——, No. 14–03–01079–CV, 2005 WL 549855 at *12 (Tex.App.—Houston [14th Dist.] Mar. 10, 2005, pet. filed) (citing *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 442 (Tex. 1997)). Thus, "when a trial court dismisses a claim because the plaintiff failed to comply with the MLIIA's procedural requirements, it is *appropriate* to file findings of fact and conclusions of law, but the trial court is not *required* to do so." *Id.*

Furthermore, as discussed in sections II–A. and II–B. above, the decisions to dismiss on the ground of an inadequate expert report and the decision to grant or deny a grace period are reviewed for an abuse of discretion. *See Walker,* 111 S.W.3d at 62 (regarding grace period); *Wright,* 79 S.W.3d at 52 (regarding expert report); *Palacios,* 46 S.W.3d at 878 (same). Unless a statute or rule specifically states otherwise, when an abuse-of-discretion standard applies on appeal, findings of fact and conclusions of law are not required. *See Winters v. Chubb & Son, Inc.,* 132 S.W.3d 568, 580 (Tex.App.—Houston [14th Dist.] 2004, no pet.) (in context of review of an award of attorney's fees, stating "findings of fact are not required in an abuse of discretion review"); *Samuelson v. United Healthcare of Tex., Inc.,* 79 S.W.3d 706, 710 (Tex.App.—Fort Worth 2002, no pet.) (holding when abuse-of-discretion standard of review applies to trial court's ruling, findings of fact and conclusions of law, although helpful, are not required).

For the preceding reasons, we conclude the trial court was not required to file findings of fact and conclusions of law and, therefore, did not abuse its discretion in declining to do so. *See Smalling,* —— S.W.3d at ——, 2005 WL 549855 at *12.

## III. CONCLUSION

Having overruled Davis's three issues in both cases, we affirm the judgments of the trial court dismissing Davis's claims against the hospital and the nursing home.