# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00705-CV

**Thomas P. McDill, Jr., Appellant**

**v.**

**Texas Department of Transportation, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. 99-13049, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Thomas P. McDill, Jr. sued appellee Texas Department of Transportation for unlawful termination, alleging violations of the Whistleblower Act.[1] *See* Tex. Gov't Code Ann. §§ 554.01-.010 (West 2004).  Following a ten day trial, the jury found in favor of the Department. McDill appeals, arguing that the trial court erred in refusing to include jury instructions related to constructive discharge and "adverse personnel actions."  We affirm the trial court's judgment.

### Background

McDill was employed by the Department as a contract claims engineer, which required him to analyze construction claims submitted by private contractors.  He reviewed project

---

[1] McDill also argued he was a victim of age discrimination, but he does not appeal that issue.

plans, interviewed involved parties, and made recommendations as to the resolution of claims. In about April 1999, issues arose in two separate claims, the details of which are unimportant. In short, McDill alleges that he reported irregularities in one claims report while the Department contends that McDill erred in his review and report of the claim, and in the other instance, McDill received a verbal reprimand for his involvement with a claim to which he was not assigned; McDill testified that he was asked by a supervisor to talk to the claimant and make a report. Regardless of which version of these events is true, McDill was not fired, nor did he quit or file a complaint. McDill was terminated in August 1999, after he took almost six weeks of vacation leave without approval.

Department policy requires employees to obtain their supervisors' pre-approval for vacation leave. At least once in the past, McDill submitted a written request for vacation to a supervisor, and in January 1999, McDill and other Department employees were asked to inform their supervisors through email about vacations and other out-of-office days. In the summer of 1999, McDill planned to drive to Wyoming to attend a family reunion and help his father with his ranch. According to McDill, he began to discuss his plans with Rolando Besa, one of his supervisors, as early as May 1999. McDill remembers talking to Besa in late May about his proposed vacation, who told him, "Okay. Let me get back with you on this"; McDill was not sure if Besa was referring to the vacation plans or to a project on which McDill was working. McDill also posted his proposed vacation on an office planning board in May or June 1999, indicating he would be gone from July 19 until August 23. McDill testified that he spoke to Besa again in the middle of June, and that Besa "seemed to indicate that that was fine" and kept using the word "okay." On July 1, McDill sent Besa an email stating, "As per our conversation last week, I intend to travel to [Wyoming] & South

2

Dakota to help my Dad on the ranch. I have six weeks leave accrued and will do some report writing while there if you would like." On July 8, Besa informed McDill that he could only approve a one-week vacation due to the Department's workload. Besa stated, "During our discussion today, you indicated your intentions of taking the vacation leave . . . whether approved or not . . . . I have explained policy requirements to you and also discussed the differences between approved vs. unapproved leave and resulting possible outcomes for employee self made decisions for taking any amount of unapproved leave." Besa also told McDill that a "high profile" report had to be finished before vacation time could be taken. McDill testified that he had never heard the claim called "high profile" before; he did, however, say it was a difficult claim that might involve a settlement recommendation as high as $100,000. McDill also testified that it would have been impossible for him to finish the report before his trip, although he had told Besa the report was 98% finished, pending the receipt of necessary data. McDill said that if he had received earlier notice of the restriction on vacation time, he might have changed his arrangements, but due to the late notice, he felt he had no option but to take his vacation as planned. McDill testified that he called human resources and asked what the consequences would be if he took several weeks of unapproved vacation. He was told that, without previous vacation-related disciplinary issues, he would not be fired and could only be subject to a progressive disciplinary action.

McDill testified that on about July 19, he broke out in hives due to work-related stress. His doctor prescribed pain killers, told him to stay home for ten days, and wrote a note to that effect, which McDill dropped off at his office. On July 22, McDill went to the office to work on a draft, but the file was missing from his desk and a coworker said Besa had taken over the project.

On the morning of July 23, McDill sent Besa an email saying that he had come in to work on the report, but could not find it. He concluded, "I now [consider] that one in your hands and I presume I will defend whatever when I return. Hope to meet with you and Human Resources at that time." McDill then left for his vacation. That afternoon, Besa replied by email, updating McDill on the situation and noting that he thought McDill would be out for medical leave until July 26. Besa stated in the email that McDill requested an extended vacation even though he knew about upcoming due dates, due dates Besa did not know about until sometime after McDill submitted his request, and said McDill's medical leave might result in further delays. Besa concluded by stating that he had left a note on McDill's desk requesting a meeting about leave time and said that he still wanted to have that meeting. McDill testified that he never saw Besa's email because it was sent after McDill left for vacation.

McDill testified that while out on vacation he called the office about once a week but was never told that his supervisors needed to speak to him or that he needed to return to work. McDill testified that he was asked if he "wanted to speak with Mr. Besa," but was not told that Besa wanted to speak to him, that there was any reason he should talk to Besa, or that Besa was thinking about firing him. McDill also testified that his mother called once to say that someone from his office had called looking for him. McDill called the office and asked Melissa Daniels, the administrative assistant McDill worked with, if there was a problem; she said "she wasn't aware of any problem or anything." McDill never spoke to or attempted to contact Besa, did not leave a phone number at which he could be reached, and told a coworker he did not want to speak to his supervisors, especially Besa, but he denied that he refused to speak with Besa. McDill originally

4

planned to return on August 18, but he decided to stay in Wyoming until the end of August because several family members died in an accident at the end of his vacation. McDill called and told Daniels about the tragedy and notified them that he would be away for another week. When McDill returned to work on September 1 or 2, he was informed that he had been terminated for abuse of vacation. McDill was "pretty amazed" and said, "It was just astounding that that happened." McDill later picked up two certified letters that had been mailed to his home address while he was away. In the first letter, the Department notified McDill that he risked losing his job due to abandonment, and in the second, he was informed that he had been fired. McDill filed an appeal and went through the Department's administrative procedure, seeking reinstatement. McDill said other employees had received progressive discipline for similar abuses and were not terminated.

Juan Urrutia, one of McDill's coworkers, testified that under an earlier supervisor, a large planning board near Daniels's desk was used to track employees' out-of-office days, but that Besa did not use the board to track leave. Although employees still wrote their leave on the board "as a planning tool," they had to obtain approval for their requested vacations. In May or June, Urrutia heard McDill and Besa discussing vacation time. He recalled that Besa said it would be "fine" for McDill to make his request by email or by "sticky-note." Urrutia testified that he understood Besa to be acknowledging McDill's vacation request, not to be approving it, but neither did he hear Besa express disapproval of McDill's request.[2] During McDill's vacation, he spoke

---

[2] Shortly after the conversation between Besa and McDill, Urrutia submitted a request for a two-week vacation. Besa initially approved the request, but later asked Urrutia to cut his vacation to one week. Urrutia agreed, but then had to take two additional days for medical reasons.

twice to Urrutia, and during the second call, Urrutia told McDill that he had to talk to a supervisor. McDill responded "strongly" that he did not want to speak to a supervisor, cursing in his response.

Melissa Daniels testified that she was the "mother hen" for McDill's group and that she used the planning board to keep track of employees' whereabouts. Daniels testified that employees could not simply write their vacations on the board and assume they were approved; employees also had to get their supervisors' approval. Daniels did not know when McDill's vacation was written on the board, but said it was "quite some time" before the vacation was to start. Daniels heard Besa and McDill discussing McDill's vacation request, and said she heard Besa use the word "okay" and thought it was in the context of, "Okay. Let's discuss it." Daniels did not recall being asked to contact McDill or to tell him to speak to Besa while he was on vacation.

Besa testified he was aware of the planning board, but said he did not use it for tracking because it was on a different floor than his office. Besa said McDill asked about vacation in May or June 1999 but did not yet have specific dates, so Besa "asked him if we could just discuss it later." Besa testified that McDill again mentioned vacation sometime before the end of June, but did not say when or for how long he intended to be gone. McDill did not "seem pressed" to get Besa's approval and did not discuss it again until the last week of June, when he asked about procedures for getting leave time approved; again, McDill did not tell Besa how many days he planned to take. Not until the last week of June did McDill tell Besa that he had already put his vacation request on the planning board. Besa looked at the board, saw McDill's notation, and said, "Don't forget, I need you to coordinate your vacation request through me." McDill asked if he could write his request on a notepad, and Besa said, "I'll take it in any form or fashion that you want to get

6

with me on it, including verbal, but just please get with me, coordinate with me on your leave requests." On July 1, McDill sent Besa an email with the dates he planned to be gone on vacation. Besa testified that when he received that email, he set a meeting, which was finally held on July 8, and after which he sent McDill the email stating that he could only approve one week of vacation. After McDill left, Besa tried to contact him, leaving messages on McDill's answering machine and calling his mother, who was McDill's emergency contact. McDill did not call Besa back, leave a message, or send a letter or email. On one occasion, Daniels told Besa that McDill did not leave a message, did not want to speak with anyone, and "doesn't ever want to talk to [Besa] again."

## Constructive Discharge

In his first issue, McDill argues that the trial court erred in refusing his requested instruction on constructive discharge. Constructive discharge occurs when an employer makes conditions so intolerable that the employee reasonably feels compelled to resign. *Passons v. University of Tex.*, 969 S.W.2d 560, 562 (Tex. App.—Austin 1998, no pet.). In a discrimination suit, constructive discharge may satisfy the discharge element of the claim. *Id*. To argue constructive discharge, it follows that the employee must actually resign his employment. *See Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 575 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("When an employee submits a letter of resignation, he may still satisfy the adverse employment action element by proving that he was constructively discharged."). Unless the employee has been compelled to resign, he has not been constructively discharged. *See id*.; *Passons*, 969 S.W.2d at 562.

The parties disagree over whether McDill's requested instruction was in substantially correct form and therefore whether McDill preserved error. *See* Tex. R. Civ. P. 278 (failure to

7

include jury instruction is not reversible error unless party seeking instruction submitted it to trial court in writing and in substantially correct form). McDill cites to a recent case from the Waco Court of Appeals, in which the court held that error was preserved under similar circumstances. *See Coley v. Baylor Univ.*, 147 S.W.3d 567, 569 (Tex. App.—Waco 2004, pet. granted). We need not address this issue, however, because assuming McDill properly presented his constructive discharge instruction and thus preserved any error, the trial court did not err in refusing it.

McDill argues that he was constructively discharged because Besa refused to allow him to take all the vacation time he sought and because Besa's decision to limit vacations to one week was made with too little notice for McDill to change his vacation plans. McDill argues that he was forced to choose between taking his vacation and possibly losing his job and cancelling his vacation altogether. However, even if we assume that being forced to cancel or severely curtail a planned vacation might amount to conditions so intolerable that an employee would reasonably feel compelled to resign, *see Passons*, 969 S.W.2d at 562, the evidence does not support McDill's argument.

McDill testified that he did not believe he would be terminated if he took his vacation without approval and he returned to work after nearly six weeks, only to learn to his surprise that he had been fired. McDill then appealed, seeking reinstatement and back-pay. McDill did not resign from his employment and there is no evidence that he felt compelled to take actions that he knew would result in his termination. Without any probative evidence of constructive discharge, *see id.*, there was no reason for the jury charge to include instructions regarding constructive discharge. *See U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 202-03 (Tex. App.—Houston [1st Dist.] 2003,

8

pet. denied). The trial court did not abuse its discretion in refusing to include McDill's requested constructive-discharge instruction. We overrule McDill's first issue on appeal.

## Adverse Personnel Actions

In his second issue, McDill contends that the trial court erred in refusing to include in the charge language related to "adverse personnel actions." McDill argues that he preserved his complaint because he "made the trial court aware of his theor[y]" that the Department took adverse actions that led to his constructive discharge. He notes that during trial, he directed the court to his third amended petition, which alleged that the Department took adverse personnel actions, submitted a pre-trial proposed charge including language related to adverse actions, and mentioned harassment and adverse actions in opening argument and at other points during the trial. These actions, he asserts, sufficiently directed the trial court's attention to his claim of adverse personnel action and to his objection that the charge did not include any such language. We disagree.

At the charge conference, McDill stated:

> [T]he plaintiff objects to the instruction to Question No. 1 that starts off, "You're instructed that Thomas McDill's report regarding the change order, Price Construction Change Order No. 5, must be such that without this report the Texas Department of Transportation's decision to terminate Thomas McDill's employment would not have occurred when it did."

The court overruled the objection, and McDill said, "Your Honor, the plaintiff has a proposed instruction on constructive discharge, which I'm handing to you at this time, in writing, and requests that it be inserted as part of the instructions under Question No. 1 in the charge." The trial court

9

denied McDill's requested instruction. McDill did not refer to adverse personnel actions at the charge conference.

It is not enough to have made the trial court aware at the beginning of and even during trial of the theory of adverse personnel actions. McDill was required to assert that theory at the close of the case as well, in the form of a written request in substantially correct form. *See* Tex. R. Civ. P. 278. Without a request for such language, the trial court could reasonably have assumed that McDill had abandoned that claim. McDill did not even make a verbal request for the inclusion of any such language, much less a written request that complies with rule 278. McDill has not preserved error with regard to any jury charge error related to adverse personnel actions. *See* Tex. R. Civ. P. 274 (party must make distinct objection to charge error), 278 (failure to include instruction generally is not reversible error if submission is not requested in writing and in substantially correct form); *Texas Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 637-38 (Tex. 1995) (error is preserved if party seeking instruction makes written request that, even if not entirely correct, makes trial court aware of complaint and obtains ruling on request); *Castleberry v. Branscum*, 721 S.W.2d 270, 276 (Tex. 1986) (rule 274 allows trial courts to correct charge errors; objection that does not clearly designate alleged error and explain grounds for complaint does not preserve error on appeal); *Reliable Consultants, Inc. v. Jaquez*, 25 S.W.3d 336, 347 (Tex. App.—Austin 2000, pet. denied) ("appellant never requested an instruction on the applicable discount rate; therefore, any complaint of the trial court's failure to submit the issue or instruction is waived"). We overrule McDill's second issue on appeal.

10

## Conclusion

Having overruled both of McDill's issues, we affirm the trial court's judgment.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   July 21, 2005

11